State *v.* Conway.

———◦•◦———

The STATE, Respondent, *vs.* CONWAY *et al.*, Appellants.

1. The finder of lost property, having no marks by which the owner can be ascertained, is not guilty of larceny, although he takes it *animo furandi.*
2. To constitute larceny, the intention to steal must have been formed at the time of the taking.

*Appeal from St. Louis Criminal Court.*

*Blennerhassett & Shreve,* for appellants. 1. Under our salvage law, and on general principles, the taking of the safe by the defendants from the river, was not only lawful, but a duty. R. C. 1845, p. 984, sec. 1, tit. " Salvage." The doing of this act was open and notorious, in broad day-light, and therefore unattended by any of those badges which are characteristic of a felonious intent. 2. If the original taking was lawful, though the defendants may *afterwards* appropriate the property to their own use, it is not larceny. 14 J. R. 294. 2 Taylor, 31. 9 Yerg. 198. 5 ib. 154. 1 Hill, 94. *State* v. *Witt,* 9 Mo. Rep. 671. If this proposition is correct, the court below erred in the instructions given and refused.

*H. A. Clover,* (circuit attorney,) for the State.

RYLAND, Judge, delivered the opinion of the court.

The defendants were indicted for grand larceny, in the Criminal Court of St. Louis county, were found guilty and sentenced to two years imprisonment in the penitentiary. A motion was made for a new trial, overruled, and the defendants prayed for an appeal, and bring the case here.

The following are the facts, substantially :

In April, 1852, the steamboat Glencoe having arrived at this city from New Orleans, and when about to take her berth at the foot of Chesnut street, blew up, and her iron safe, containing about $600 in gold, silver and paper money, was thrown into the river, first striking against some barrels on the adjoining boat. From the evidence preserved, the defendants' counsel contended that, in this concussion, the presumption was that the door of the safe was broken. The safe lay in the river until the following July or August. A few days after the loss of the Glencoe, Brookes, one of the owners, learned

about where the safe was in the river, and in his testimony says, that he did not try to recover it, in consequence of the high water, but employed a man to recover it when practicable, and that no direct efforts were, at any time, made to find it in the river. He also states that, in the notice of loss served on the Insurance company where the Glencoe was insured, this safe and contents were included. In July or August, 1852, and about ten o'clock in the forenoon, nine or ten men, among whom were the defendants, discovered the safe, and, with the assistance of some of the officers, among whom were some of the officers of an adjoining boat, got the safe out of the river, and put it on a dray and took it to a house on an alley in the northern part of the city, where one of the defendants lived. Brookes, the owner, having learned the fact the same morning, tracked the safe through the streets, by the black water that fell from the dray. He found the men in the room and two women. The money was in a tray on the table, around which the men stood as though counting it. Brookes said the money and safe belonged to the owners of the steamer Glencoe, and told them not to interfere with it, and they would be well paid for their trouble; they, (two of the defendants,) said they found it in the river and claimed that they were entitled to it. Brookes went off for Mr. Finney. He and Mr. F. got some police officers, and on their return ascertained that the men went out on the plank road into the country. They were pursued and were caught in a corn field about three miles from the city, and some of the money, claimed to be taken from the iron safe, found on them. The jury might well find, from the evidence, that they tried to escape and conceal themselves from those in pursuit of them.

Upon the facts in proof, the defendants prayed the court to give the following instructions :

1. If the jury find from the evidence, that the defendants, or either of them, found the iron safe in question in the Mississippi river, and not knowing the owner or owners thereof,

and believing it was lost, took it openly in the day-time, without any attempt at concealment, the jury will acquit.

2. If the jury find from the evidence, that the safe in question was blown from the steamer Glencoe into the Mississippi river, in the month of April last, and that the same was in a perishable condition, then the defendants had a right to take such safe and contents out of the river and reduce it to their possession, and their subsequent acts will not make them guilty of a felonious taking.

These instructions the court refused to give. The court then gave the following instructions :

1. If the jury find from the evidence, that the defendants, or either of them, found the iron safe in question in the Mississippi river, and not knowing the owner or owners thereof, and believing it was lost, took it openly in the day-time, without any attempt at concealment or to steal the property found, at the time or subsequently, you will acquit.

2. If the jury find from the evidence, that the safe in question was blown from the steamer Glencoe into the Mississippi river in the month of April last, and that the same was in a perishable condition, then the defendants had a right to take such safe and contents out of the river and reduce it to their possession.

3. If the jury believe from the evidence, that the defendants took and carried away the safe and contents in question, and that the said safe had, by an explosion of the steamer Glencoe, been cast into the river, but not abandoned by the owners or lost to them from want of knowledge of the whereabouts of the same, and if the jury believe that the owner had, by himself or his agents, used efforts for the recovery of the said safe, and at the time of the taking of the same by the defendants, was yet using efforts for its recovery, then the safe was not lost property, in the contemplation of the law respecting salvage ; and if the jury also believe from the evidence that, at the time the defendants took the safe, they knew who the owner was, or, on

the other hand, had, at the time, readily and instantly the means of knowing who he was, either by marks about the property, or by inquiry from the bystanders, and they took it with the intent to steal it, then the taking of the same, under the circumstances named, renders the defendants liable as for a larceny ; but if, after the taking of the safe from the water, the defendants, or either of them, took from the safe any of the money charged in the indictment, with the intent to steal it at the time of the taking, and you have no reasonable doubt of it, and to deprive the owner thereof of its use, and that the value of the money so taken was ten dollars or upwards, ·you will find such defendant or defendants guilty of grand larceny. But if you believe that any of the defendants did not entertain the intention to steal the money at any time, you will acquit such defendant or defendants.

4. Without the jury believe from the evidence in the cause, that the defendants, or either of them, took the property in question, and at that time the defendants, or either of them, did so take with a felonious intent, you will return a verdict of not guilty in the case.

5. If the jury can agree as to the guilt or innocence of any of the defendants, they can return a verdict in accordance with the fact.

6. If the jury entertain a reasonable doubt as to the intent of taking the chest or money upon the part of any of the defendants, you will acquit such defendant or defendants.

1. We have no statute law making the finding and conversion of lost property larceny, and the rule of the common law must then be applied to this case. At common law, larceny is defined to be the wrongful taking and carrying away of the personal goods of another from his possession, with a felonious intent to convert them to the use of the offender, without the consent of the owner. The taking must be done *animo furandi*, or *causa lucri*. Every larceny includes trespass ; every indictment for larceny must have the words *felonice cepit* as well as *asportavit*. The felonious intent is the mate-

rial ingredient in the offence. There cannot be a larceny without a felonious intent. The taking the personal goods of another, without this intent, may be a trespass, but it cannot amount to a larceny.

A claim for property stolen is frequently set up as a defence in prosecutions for larceny. It is always a question for the jury, whether such a pretension is an after thought to screen a felonious intent, or whether the property was taken in good faith or not, under a belief that the party had the right to it. *Witt* v. *The State*, 9 Mo. Rep. 672.

In the case of the *People* v. *Cogdell*, 1 Hill, 94, the facts were much stronger against the accused than in the case now before the court, yet the Supreme Court of New York held, that they did not amount to larceny. In this last case, the defendant, Cogdell, was convicted at the Orange Oyer and Terminer, October, 1840, of feloniously stealing, &c., the pocketbook of John Warren, and bank bills therein belonging to him, amounting to $600. Warren lost his pocket-book on the highway, and the defendant found it and immediately after concealed it, with the bills, fraudulently and with intent, as the prosecution insisted, to convert the whole to his own use. The evidence was entirely sufficient to warrant the jury in so finding. The court left the facts to the jury as sufficient to warrant a conviction, and the prisoner's counsel excepted. Cowen, J., delivered the opinion of the court. He said, " there was abundant proof of the concealment and fraudulent conversion of the money after it had been found. This was, undoubtedly, under a full consciousness in the prisoner, that it was accidentally lost. It was immediately demanded of him by the owner, who suspected his having found it, but the prisoner denied the finding, and concealed the bills. By the owner's good fortune, they were traced to the hands of the prisoner, and finally restored; but this was after a course of evasion and concealment, plainly indicating his fraudulent intent to keep the money, if possible. It did not appear in evidence, that the pocketbook or money had any mark by which the prisoner could have

discovered Warren to be the owner, though he must have been conscious that the owner, whoever he might be, would make an effort to find the money. He did make such an effort, offering a reward to the prisoner personally. In short, the loss and finding were purely accidental. Every thing after that, done by the prisoner, was characteristic of the thief, and if he can escape the legal consequences of the conviction of larceny, it must be solely because that crime is not predicable of a taking and conversion under the circumstances mentioned. Singular as it may seem to one reasoning on principle, this appears to be the settled doctrine of the law, and was so considered by this court in the *People* v. *Anderson*, 14 Johns. 294. If the owner has placed no marks about the property, and none exists by which the finder can discover him, the case must still be considered, as it long has been, one of mere trover and conversion, not of larceny." The court reversed the judgment and ordered a new trial. In *Wright* v. *The State*, 5 Yerger's (Tenn.) Rep. 154, the Supreme Court of Tennessee held that, to constitute larceny, there must be a trespass in the taking, and if goods are lost, there can be no possession upon which there can be a trespass. According to the Tennessee doctrine, even the mark upon the pocket-book or goods lost, plainly pointing out the owner, would not constitute him who found and concealed and converted the pocket-book or goods to his use, a thief.

It was held in Tennessee that, where the possession of personal property was obtained from the true owner by false and fraudulent representations, under pretence of hiring, the party thus obtaining the property, intending, at the time, to convert it to his own use, was not guilty of larceny. *Felter* v. *The State*, 5 Yerger, 397. *State* v. *Long*, 1 Haywood, 154. *State* v. *Braden*, 2 Tenn. Rep. 68. This doctrine is contrary to the settled doctrine of the English courts on this subject, and contrary to our notions of the law. It is admitted, even in Tennessee, to be against the settled law of England and against the common law, as settled in several of the states of

the Union.  5 Yerg. 406.  There is one case in which it has been holden, that the taking will not amount to larceny, though it be accompanied with the *animus furandi*, namely, where the taking is by a finding of the property.  Thus it is laid down in the books, if one lose his goods, and another find them, though he convert them, *animo furandi*, to his own use, yet it is no larceny, for the first taking was lawful.  2 Russell on Crimes, 100.  In a case before Lawrence, J., at the Stafford Summer Assizes, in 1804, the prisoner was indicted for larceny.  It appeared that a pocket-book, containing bank notes, had been found by the prisoner in the highway, and afterwards converted by him to his own use.  Upon this, Lawrence, J., observed that, if the party finding property in such a manner knows the owner of it, or if there be any mark upon it, by which the owner can be ascertained, and the party, instead of restoring the property, converts it to his own use, such conversion will constitute a felonious taking.  2 Russell on Cr. 102.

Here nine or ten men found a safe in the Mississippi river ; there was no particular mark upon it except the secret spring ; nothing about it to designate it from any other safe.  A stranger could not tell that it belonged to the " Glencoe" any more than to any one of the ill-fated boats destroyed at the same wharf by fire in May, 1849.  These nine or ten men, in daylight, by the aid of a rope lent them by an officer of a steamboat near at hand, dragged this safe from the river, and in presence of a crowd of thirty men or more, put it on a dray and carried it to a house in the city, where one of these defendants lived.  They were some fifteen minutes taking the safe from the water to the dray ; no concealment—they claimed it as theirs, by finding ; they forced it open and took out the money.  When told not to disturb it, at the house to which it had been conveyed, that it was the Glencoe's safe, to keep it for the owners and they would be well paid for it, they claimed it as theirs by finding.  Though their conduct was wrong and showed them to be unmindful of the duties of good and hon-

est men, yet, from all the evidence in the case, they were not guilty of larceny. The instructions asked for them by the defendants should have been given.

2. The instruction first given as above, by the court, was improper; it did not embody a correct legal principle; the words " or subsequently," clearly render this instruction illegal. Such never was the rule of adjudication, either in England or in the American courts. The intention to steal must be formed at the time of taking or acquiring possession of the goods. The hirer of a horse for two days, to go to a place north, who, afterwards, when he has obtained possession, turns to the south and sells the horse as his own, is not guilty of larceny, unless he had formed in his mind the design and intent to steal the horse at the time of the hiring—not afterwards; subsequent intent to steal will not make the taking felonious. I take notice of this instruction and the two refused on the part of the defendants as wrong. In a case so plain as this, this number might have answered, if properly given.

The judgment of the court below is reversed, the other judges concurring.