## LUDWIG v. THE STATE.

[No. 21,144. Filed July 1, 1908.]

1. NEW TRIAL.—*Newly-Discovered Evidence.*—In order to be a ground for a new trial, newly-discovered evidence must be of a very material character, and well calculated to bring about a different result. p. 653.

2. SAME. — *Newly-Discovered Evidence.* — *Blood Stains.* — *Fire.* — *Murder.*—In a prosecution for murder where there was evidence showing that a husband who, when found, was slashed in several places with a razor, had killed his wife in a closet, had gone down stairs, started a fire in the cellar and obtained gasoline to pour upon the wife's clothes in order to destroy her body, a new trial, because of newly-discovered evidence, should not be granted, where such evidence merely explains the existence of the blood stains on the stairway and on the summer kitchen door, and which denies or explains the fire in the cellar, there being no evidence that the wife had inflicted the cuts upon the husband, and the hypothesis that the husband went down stairs before slashing himself being as strong as that it was done afterward. p. 654.

3. HOMICIDE.—*Murder in Commission of Arson.*—*Conviction for Lower Offense.*—The killing of a person in the commission of arson constitutes murder in the first degree; but a defendant guilty of such crime will not be heard to complain that his sentence is too light. p. 655.

4. SAME.—*Murder.*—*Malice.*—Where defendant, after an altercation with deceased, purposely did an act to hasten the death of deceased, the jury may infer malice in fact, and thus find him guilty of murder in the second degree. p. 655.

5. NEW TRIAL.—*Newly-Discovered Evidence.*—*Cumulative.*—A new trial will not be granted upon newly-discovered cumulative evidence. p. 657.

6. EVIDENCE.—*Murder.*—*Feeling Between Parties.*—Excluding evidence of a remark made by decedent, who was defendant's wife, some weeks before her death, or evidence that defendant had been advised to leave his home, or that loud, angry and profane lan-. guage was heard at the home the night before, is harmless, where the relations between the parties, deceased's hatred toward defendant, and her threats concerning him appeared from other evidence. p. 657.

7. SAME.—*Hypothetical.*—*Assumption of Facts.*—Sustaining objections to hypothetical questions, involving the assumption that defendant could not recollect anything after the homicide, is harmless,· where the attempt is to show by the answers thereto that defendant might have had a loss of memory, be unconscious of pain, or whether he could recollect, after restoration of consciousness, the things which occurred during unconsciousness, since if the assumption were granted the rest would follow as a matter of common knowledge. p. 658.

8. APPEAL.—*Bills of Exceptions.*—*Instructions.*—*Criminal Law.*— Instructions, in criminal cases, can be brought into the record on appeal only by a bill of exceptions, and such bill must show that the defendant or his attorney signed same; and instructions copied into the transcript as a record entry cannot be considered, §2165 Burns 1908, Acts 1905, pp. 584, 648, §249, not authorizing the filing of such bills. p. 658.

From St. Joseph Circuit Court; *Walter A. Funk,* Judge.

Prosecution by the State of Indiana against Albin R. Ludwig. From a judgment of conviction, defendant appeals. *Affirmed.*

*Anderson, Parker & Crabill,* for appellant.

*James Bingham,* Attorney-General; *A. G. Cavins, E. M. White* and *H. M. Dowling,* for the State.

GILLETT, C. J.—The appellant appeals from a judgment whereunder he stands convicted of murder in the second degree. The principal question in the case is whether a new trial should have been granted on account of newly-discovered evidence.

In the determination of this question we have carefully abstracted the evidence given upon the trial, but shall only

state so much of it here as seems necessary to an understanding of the facts on which our observations are based. The deceased was appellant's wife. She was a large-framed woman, somewhat larger than her husband, and weighed perhaps 170 pounds. It was her purpose to leave appellant, and during the morning of the day on which her death occurred she had been engaged in packing her trunk, in a closet off the east side of the upstairs bedroom. Early in the afternoon of that day smoke was seen issuing from the second story of their home. Access was obtained to said room by means of a ladder, and appellant was found, apparently unconscious, in the room thus entered, suffering from a cut across his throat and also upon his wrists and calves. He was carried down the ladder, and upon being laid on the ground he vomited. The fire was almost wholly in said closet, and we infer that the door thereto was closed, or practically so, as the firemen testified that it was open. The door swung into the room, and against a double window. There seems to have been some plants in one or perhaps both of these windows, and they were probably knocked over by the men in entering the room. A fireman, who reached the scene as appellant was being carried down the ladder, testified that there was a rocking chair and a Boston fern in front of the closet door, and that he had to remove them in order to open it. He testified that the plant was not tipped over, and that the dirt was not spilled out of the pot. The other witnesses do not appear to have observed these facts, and a witness for appellant stated that, to the best of his recollection, there was nothing in front of the door. When the fire was extinguished, it was found that the body of deceased was in the closet. A bloody razor was found in the bedroom. Blood was upon the floor, upon the pillows, and upon the spread of the bed, and there were blood stains on the outside of the closet door. The key to the closet door was broken, and a piece of it was found nearby. There was an empty can in the closet, and there

is evidence that it smelled of kerosene, and another witness testified that it smelled of gasoline, although other witnesses testified that they could not detect any smell.     There was also a potato masher in the closet, and appellant's brother testified that he afterwards found in the rubbish therein a lamp burner and a large number of pieces of glass.     The State introduced evidence of the existence of blood marks upon the stair railing, and upon the frame of the door leading into the summer kitchen.     A witness for the State testified that he found a bundle of papers, about as large as the rim of his hat, smoldering in the basement; that they were lying upon a cement shelf or ledge, about one foot from the window, and about eighteen inches from the joist.     There was also evidence of appellant's purchase of a can of gasoline that morning; that the can was found in the summer kitchen with a part of the contents (between a pint and a quart) removed, and that the tank of the stove was practically empty.     There was no mark of blood upon the can. There was a post-mortem examination held, and the physicians were of opinion that deceased came to her death by burning.     The heart and lungs were taken out by the physicians, but it does not appear that the examination was sufficient to determine whether deceased suffered from heart disease.     Appellant testified that deceased had had a weak heart for about a year.     There was a wound found upon her head, and her throat was bruised.     The skull was not fractured.     Appellant testified that after returning with the gasoline he put some of it in the tank of the stove, and his wife cooked a boiled dinner on said stove; that after partaking of the coffee he became sick; that after getting a slop jar from out of doors (he is corroborated in this), he took it upstairs, placed it in said closet, and then lay down; that while so doing he thought of an insurance policy which he had taken out in his wife's favor, and, fearing that she would take it away with her, he went to look for it in the dresser, where it was kept; that, not finding it,

he lighted a lamp and went into the closet to search her trunk; that he was holding the lamp in his hand when she came up and asked him what he was doing; that words followed about the household goods, and that she, applying an opprobrious name to him, struck at him with a potato masher; that he warded off the blow, and seized her by the throat and held her against the wall. As he explained: "When I let loose—she kind of clawed me—and when I let loose, she went down." He testified that he heard the potato masher fall. Upon being asked to testify what he recollected and what he did after that, appellant answered: "I don't recollect anything after that—the shock." He claimed to have been unconscious from that time until after he was in the hospital, but a physician testified that he was of opinion that appellant was conscious, as he detected resistance in his effort to raise one of appellant's eyelids. Another witness testified that he saw appellant open one of his eyes while being taken to the hospital. The policy was afterwards found in the trunk. There is evidence that appellant stated, while at the hospital, that he lay down on the bed, face down, and when he revived he was cut, and that he did not know how it happened; that he said his wife did the cutting, and that, in response to a question as to why he killed his wife, he answered: "Why did she cut me?" There is also testimony that appellant stated that he did not know how the fire happened, but that he saw his wife take a cup of gasoline upstairs to clean a skirt. Appellant's version of the statement was that he had said that he knew nothing about the oil; that his wife had spoken that morning about taking some spots out of a black skirt, and that she always did so with gasoline; that the person to whom he made the statement said, "Did she?" and that he answered, "I don't know." So far as we have observed, appellant denied all incriminating statements. He particularly denied that he went down stairs after the altercation, and he testified that he did not take any oil, other

than that which was in the lamp, into the closet. He offered expert evidence to account for the wound on the head of deceased, on the theory that her head came into contact with one of the wire clothes hooks which were upon the walls of the closet. There was evidence of the unfaithfulness of deceased, of appellant's upbraiding her therefor, of her threats, and of his evident consciousness that a crisis of some character was approaching in their affairs. There was also evidence of many other details of more or less importance in the presentation of the case to the jury, but we do not pause to mention them here.

The newly-discovered testimony, for which a new trial is sought, satisfactorily accounted for the blood stains upon the stair rail and upon the frame of the door leading to the summer kitchen. Such testimony also tended to show that there was no fire in the cellar, and, if there was, to furnish a possible theory of its accidental presence there—that is, from the throwing out of the upper window, by one of the witnesses, of the covering upon the dresser, which was beginning to burn. There was also an attempt, by affidavit, to show how the matters referred to were used by the prosecuting attorney in his closing argument to show that appellant, after rendering his wife unconscious by a blow upon the head, had dragged her into the closet, and, after inflicting certain of the wounds upon his person, had gone down stairs to set the fire in the basement, and to procure gasoline to pour over his wife's clothing, after which he set fire to her.

It was said by this court, speaking by Mitchell, J., in *Cooper* v. *State* (1889), 120 Ind. 377: "New trials for newly-discovered evidence ought only to be granted

1. after the most careful scrutiny of the evidence alleged to have been discovered, and when it raises a violent presumption that a different result would be reached upon a second trial." Citing Thompson, Trials, §2759; *Hines* v. *Driver* (1885), 100 Ind. 315. In the case last

cited the court said, concerning the Indiana decisions upon the subject: "All of the cases agree that the newly-discovered evidence must be of such a character as to make it obvious that a different result would be produced on another trial, or, as some of them say, 'raise a violent presumption' that it would change the result. *Hull* v. *Kirkpatrick* [1853], 4 Ind. 637; *Taylor* v. *State* [1853], 4 Ind. 540; *Rainey* v. *State* [1876], 53 Ind. 278. But, whatever may be the correct form of expressing the rule, it is undoubtedly true, as said in *Swift* v. *Wakeman* (1857), 9 Ind. 552, 'in such applications the parties seeking a new trial must make a strong and clear case.'" Without again attempting to reframe an exact statement of the rule, it is enough, for present purposes, to say that, at the least, the evidence must be of a very material character and well calculated to bring about a different result. See *Presser* v. *State* (1881), 77 Ind. 274; *Hamm* v. *Romine* (1884), 98 Ind. 77; *Sutherlin* v. *State* (1886), 108 Ind. 389; *Morrison* v. *Carey* (1891), 129 Ind. 277; *Jackson* v. *Swope* (1893), 134 Ind. 111; *Smith* v. *State* (1896), 143 Ind. 685; *Donahue* v. *State* (1905), 165 Ind. 148.

So far as we can perceive, the only effect of the newly-discovered evidence as to the manner in which the blood stains came to be on the stair railing and upon the door-case was to explain, by direct evidence, what might reasonably be conjectured before, as the evidence upon the trial showed that the first man to enter the house was some one who was referred to in the evidence as a stranger. The case against appellant, however, would have been quite as strong with the existence of such blood stains explained, since the hypothesis that appellant went down stairs, after inflicting some of the wounds upon his person, would have involved the objection that other blood marks would, in all probability, have been found upon the gasoline can and elsewhere, if, indeed, his steps would not have been marked by a trail of blood.

. The killing of a human being in the perpetration of, or attempt to perpetrate, the crime of arson is murder in the first degree. Appellant cannot, however, complain

3. that he has not been convicted of the capital offense, and the question therefore remains whether, in the circumstances of the new evidence being introduced, it could reasonably be expected that the jury might acquit him or find him guilty of manslaughter.

The deceased came to her death as the result of the struggle in the closet. It might be conceivable that at the moment she sank to the floor appellant became unconscious, but it passes belief that, after receiving the wound she did, she inflicted the wounds found upon her husband, while he was upon the bed and elsewhere in the room. The door, had it been open, might have been closed by the firemen, who went in the east window, but there is no explanation afforded for the fact, if it be such, that the plant and the rocking chair were in front of the door, and the fact that there were blood stains upon the outside of it (it must be remembered that appellant claims that the fight occurred within the closet) leads almost irresistibly to the conclusion that appellant closed the door after his wife was in the closet. The jury could not have been expected to believe that, while in a state of unconsciousness, appellant made the cuts which were upon his own person. The only rational hypothesis, if weight be given to appellant's claim as to the prior facts, is that he sought refuge in the pretense that he became unconscious at the conclusion of the altercation to escape the difficulties which would arise from the effort to explain, not alone why the door to the closet was closed, and his wife left therein to be burned, but why subsequently he should have attempted suicide. Taking his own claim as to the altercation, and indulging the supposition that the fire was in some way set from the lamp,

4. and the fact of the closed door puts upon him the burden of having closed it that flame and smoke

might the sooner accomplish his wife's dissolution. This justified the conclusion that appellant purposely caused her death, and, in the absence of all explanation for such an act upon his part, the jury could scarcely have failed to draw the inference of malice. It was stated in *Ex parte Moore* (1868), 30 Ind. 197, 200, "that where one person unlawfully and purposely kills another, malice, in the absence of rebutting evidence, is presumed from the act." See, also, 21 Am. and Eng. Ency. Law (2d ed.), 138-140. While it may be that the case from which we have quoted goes too far in making the presumption of malice one of law, yet, in view of the right of the jury to draw the presumption, it could scarcely be supposed, in the practical administration of justice, that a defendant could escape the conclusion when it appears that after a minor altercation he intentionally does an act to hasten, if not originally to cause, the death of the helpless victim by a most cruel means. These considerations show that the conclusion of the jury, that appellant was guilty of murder in the second degree, was fully supported, and we may further add that a case was made out which was within the allegation of the indictment. Indeed, we may go further and affirm that, apart from the question of whether appellant went down stairs, the jury would have failed in its full duty if it had not convicted appellant of murder in one of its degrees. In view of the extent that appellant was discredited by his story upon the witness-stand, it appears to us most unlikely that a jury would be disposed to believe the testimony from which he would have them draw the inference that his wife died of heart disease as the result of the excitement which the altercation occasioned, and, we may further add, such a theory would involve a mere conjecture concerning the result. The evidence against appellant is far too convincing to admit of the adoption of the suggested theory. We do not think that the jury was warranted in concluding that deceased was choked to death,

In view of the conclusions just stated, we might pass by the question of whether there was a fire set in the cellar.

5. As evidence of an attempt at arson, the testimony as to the manner of its commission was so trifling that it was likely to fall of its own weight. Appellant introduced the testimony of a witness to prove that there was no fire in the cellar at the time he was down there. The new evidence upon this point might have been more satisfactory, on account of the time that it related to, but it was really cumulative. *Williams* v. *State* (1908), *ante*, 630; 12 Cyc. Law and Proc., 992. Besides, we may state that it appears to us that the jury must have concluded that the idea that a fire was set where it could not reasonably be expected to burn anything was a figment of the imagination of the witness who testified to it. We cannot hold that a new trial should have been granted on the theory that the burning cloth or material thrown from the upstairs window might have blown into the cellar, as the witness who testified to the fire there, if he is to be believed, also testified that the cellar window, which was near the burning paper, was closed.

6. There was no error in excluding the testimony of a remark made by deceased some weeks before, or of the fact that appellant had been advised, shortly before his wife's death, to pack up and leave, or of the fact of the overhearing of loud, angry and profane language in the house the night before. The unhappy relations of the couple, deceased's hatred of appellant, and threats concerning him, as well as the fact that a separation was imminent, sufficiently appear. Besides, in view of the evidence as to the circumstances attending the death, we fail to perceive any ground for the view that the excluded testimony could have in anywise aided appellant.

Complaint is made of the exclusion of certain items of expert testimony. The hypothesis, by which it was sought

to secure the opinion, involved the assumption, among other matters, that the person thus referred to had no recollection of anything that occurred after the homicide, and the questions called on the witness to state whether, in the circumstances enumerated, such person would or might have an entire loss of memory, and be unconscious of pain or of the events succeeding the homicide, or whether he would have a knowledge of, or would recollect, such facts or circumstances after recovering consciousness. The objection to both questions lies in the assumption which the hypothesis involved, that there was no recollection of anything that occurred after the homicide. If this were granted, it seems to us that as a matter of common sense the rest would follow. Other questions concerning the admission or rejection of testimony are waived. *Pittsburgh, etc., R. Co.* v. *Lightheiser* (1907), 168 Ind. 438.

A new trial is sought because of the refusal of the court to give appellant's instructions fifteen and nineteen, but at this point we are met with the objection of the Attorney-General that the bill of exceptions containing said instructions does not show that they were signed by appellant or by his attorney, as required by §2136 Burns 1908, cl. 6, Acts 1905, pp. 584, 641, §260. We held in *Donovan* v. *State* (1908), *ante,* 123, that instructions given and refused by the court, and exceptions to the same, can only be made part of the record in criminal cases by a bill of exceptions. See, also, *Williams* v. *State* (1908), *ante,* 642. The bill of exceptions in this case does not show who signed the instructions tendered. We find among the record entries a set of instructions like unto the instructions which the bill sets forth as tendered to the court and requested to be given by the defendant, and said set of instructions is preceded by a request that they be given to the jury, which is signed by the attorneys for defendant. There is nothing in said subdivision that requires that the signed

instructions refused, or a signed request therefor, should be filed, and therefore the instructions and signed request therefor set forth in the record entries are not a part of the record by virtue of §2165 Burns 1908, Acts 1905, pp. 584, 648, §289. Besides, since we cannot consider the instructions set forth in the record entries, it results that we cannot determine from a request appended thereto that the instructions set forth in the bill were duly signed by the defendant or by his attorney. We are constrained to hold, in view of the state of the record, that error cannot be predicated on the refusal of instructions fifteen and nineteen.

Judgment affirmed.