## RHODES *v.* STATE OF INDIANA.

[No. 25,722.   Filed July 3, 1930.   Rehearing denied September 18, 1930.]

*Shuler McCormick* and *Padgett & Padgett*, for peti-
tioner.

*James M. Ogden*, Attorney-General, and *E. Burke
Walker*, Deputy Attorney-General, for the State.

MYERS, J.—On change of venue to the Gibson Circuit
Court from the Knox Circuit Court, appellant was tried
before a jury and a verdict returned finding him guilty
of murder in the first degree and fixing the penalty at
death. Judgment and sentence in accordance with the
verdict. On appeal to this court, he has assigned as
error the overruling of his motion for a new trial, wherein
error is predicated on the court's refusal to give to the
jury certain of his tendered instructions; remarks of the
trial court during the trial in the presence of the jury
asserted to be prejudicial; newly discovered evidence;
verdict contrary to law because not sustained by suffi-
cient evidence.

The State first insists that none of the instructions,
either given or refused, are properly a part of the record
in this case. On November 17, 1928, at the close
of the evidence and before the beginning of the
argument to the jury, the defendant tendered to
the court 11 instructions and requested that they be
given to the jury. The request as to Nos. 4, 5 and 6 was
granted, and the others refused. In the clerk's tran-
script of the record on appeal appears what purports to be
a transcript of the request, the instructions tendered,
together with instructions, 21 in number, given by the
court upon its own motion. The same request and in-
structions refused and given were also incorporated,
along with the original typewritten transcript of the evi-
dence furnished by the official court reporter, as a part

of the original bill of exceptions. This bill was properly certified by the trial judge and timely filed. There was no attempt to bring the instructions into the record in any other manner. This being an appeal from a judgment in a criminal action, the Criminal Code on the subject it covers must be followed in making up the record on appeal.

Acts 1897 p. 244, §1 and Acts 1915 p. 122, §§691, 2332 Burns 1926, afford a complete procedure for making the reporter's longhand or typewritten transcript of the evidence and matters connected therewith a part of the record on appeal without transcribing the same, and it was followed in the instant case. The reporter's transcript of the evidence is regarded as an original document and the only original instrument or paper connected with the trial court's record of the case that may properly be made a part of the record on appeal.

Looking to appellant's insistence that the instructions given and those refused are in the record at bar and therefore subject to review by this court, we need only point to §691, *supra*, which is exclusive with reference to the subject-matter which alone may be included in "the original bill of exceptions." Anything other than the evidence and matters connected therewith must be disregarded. *Rhodes* v. *State* (1930), *post* 173, 171 N. E. 301. True, as appellant contends, §2332, *supra*, also authorizes the insertion of an original bill as a part of the transcript on appeal, and provides "that every pleading, motion in writing, report, deposition or other paper, filed or offered to be filed, in any cause or proceeding, whether received by the court, refused or stricken out, shall be a part of the record at the time of such filing or offer to file; and any order or action of the court in respect to any" of such matters, "and every exception thereto taken by any party shall be entered by the clerk on the minutes or record of the

court, and the same, when so entered shall be part of the record without any bill of exceptions."

Section 2301 Burns 1926, cl. 5, makes it mandatory upon the trial court, when requested so to do by the prosecuting attorney, the defendant or his counsel, before the commencement of the argument, to charge the jury in writing, and clause 6 not only authorizes either party to ask for special instructions, and provides how they shall be prepared, but requires that they be "delivered to the court before the commencement of the argument."

It will be noticed that instructions to the jury are not in the list of items mentioned in the statute as "filed or offered to be filed" unless, as appellant contends, they are covered by the words "other paper."

Inasmuch as our criminal procedure requires that special instructions be tendered to the court, and makes no provision for their filing or offer to file, or that the instructions given by the court on its own motion be filed, the only method by which they may be made a part of the court's record below is by what is usually termed a special bill of exceptions, presented, within the time allowed by law or the order of the court, for signature and approval of the judge, and thereafter filed with the clerk. In the instant case this procedure was not observed. Hence, the instructions given or those refused never became officially a part of the record of the trial court. The record on appeal should show not only the record entry of the filing of the special bill by the clerk below, but the bill itself must be transcribed and incorporated into the record brought up. *Donovan* v. *State* (1908), 170 Ind. 123, 83 N. E. 744; *Williams* v. *State* (1908), 170 Ind. 644, 85 N. E. 349; *Ludwig* v. *State* (1908), 170 Ind. 648, 85 N. E. 345; *Carr* v. *State* (1911), 175 Ind. 241, 93 N. E. 1071, 32 L. R. A. (N. S.) 1190; *Messel* v. *State* (1911), 176 Ind. 214, 95 N. E. 565; *Hahn*

v. *State* (1916), 185 Ind. 210, 113 N. E. 725; *Barker* v. *State* (1919), 188 Ind. 493, 124 N. E. 681; *Gillespie* v. *State* (1924), 194 Ind. 154, 142 N. E. 220; *Steinmetz* v. *State* (1925), 196 Ind. 153, 147 N. E. 618; *Fritz* v. *State* (1926), 198 Ind. 229, 153 N. E. 408. We must decline to consider questions pertaining to instructions given or those refused.

The alleged harmful remarks of the court in the presence of the jury call for a brief statement of what happened between the parties to the altercation at the place of the homicide, as the witnesses saw it.

Appellant and a person by the name of Albert King were together in the city of Vincennes on April 1, 1926. Each of them had purchased cigarettes at a candy store operated by a Greek on the south side of Main Street, west of Fourth and opposite the police station in the city hall. Each paid with a $5 bill and received the difference in change. Later, the Greek doubted the genuineness of the $5 bills. He went across the street to police headquarters. Four officers were there, to some of whom he exhibited the money. Two of these officers, Simon Carrie, dressed in citizens' clothes, and M. L. Hindman, day captain of police, in uniform, accompanied the Greek to find the men who had bought the cigarettes. When they reached a point about half way between Fifth and Sixth Streets on the north side of Main Street, the Greek pointed out appellant and King, who were on the south side of the street and almost directly in front of what is known as the "Knights of Columbus Home." The officers and the Greek crossed the street, the Greek a little in advance, Carrie to the left, and Hindman a short distance in the rear and to the right of the Greek. On reaching the south side of Main Street, and within the presence of appellant and King, some one gave the command "halt." Nine persons, all within 150 feet, three of whom were within 40 feet of the

place of the homicide, were eye witnesses to the occurrence, their attention having been drawn to the place by the actions of the Greek and officers. Two other persons on the north side of Main Street and approximately 100 feet west of Fifth Street testified they saw the five men in action in front of the K. of C. Home, and, in their opinions the person shot was in uniform. One of these witnesses heard one shot and the other heard none at that point, nor did they hear any other shots fired by Rhodes or King until they reached Sixth Street. The nine witnesses who were in close proximity to the place of the homicide, and all giving attention to what was going on, are not agreed as to the number of shots fired at that point. The policeman in uniform and one other heard but one shot. All of the others heard at least two and some as many as three or four, and the first two followed each other in quick succession. One of these shots killed Carrie. In the opinion of the witnesses, from the sound of the shots, two guns were in use. Without dispute, it appears that Rhodes had a .38 Colt's automatic loaded with steel-jacketed bullets. King had a .45 loaded with soft-nosed bullets. The policeman in uniform had a .38 loaded with soft-nosed bullets. Witnesses designated Rhodes and King as Rhodes being the taller of the two. The witnesses all agree that King was on the inside of the sidewalk next to the buildings, and Rhodes on the outside. Some of them say that, as soon as the officers came up to Rhodes and King, Carrie stepped in front of Rhodes, placed his hand on Rhodes' shoulder, then Rhodes backed away toward the building and fired the first and fatal shot from his hip; while other witnesses, one of whom was Raymond Winneger, testified that when Carrie came up to Rhodes, the smaller man whirled and shot Carrie, and then ran up the steps onto the porch of the K. of C. building, and

that Rhodes fired the second shot with the revolver at his hip.

The coroner, Dr. E. H. Pea, performed the autopsy upon the remains of Simon Carrie, and, after describing the course of the bullet through the body of Carrie, gave an opinion from all the facts he discovered in making the autopsy, that the wound which caused Carrie's death was made by a .38 soft-nosed bullet.

Appellant, immediately after his arrest, in talking with peace officers and other persons, said, in substance, that in taking his gun out of his belt he accidentally discharged it and killed Carrie.

It is evident that one of the most important questions for the jury alone to determine was: "Who fired the fatal shot?" According to Winneger's testimony, in addition to that above pointed out, he was on the south side of Main Street in front of the Belvedere Restaurant on the southwest corner of Main and Sixth Streets, and had an unobstructed view of all that occurred between Rhodes, King and the officers, and was positive, from the actions of Carrie, that it was the first shot that killed him. All of the witnesses who testified on that subject said it was the first shot that hit Carrie. Two high-school girls, on the north side of Main Street and a little east of the scene of the shooting, testified that they also saw the officers stop Rhodes and King, and that the smaller man of the two whirled and fired the first and fatal shot. Mrs. Candler testified, in substance, that she was on the south side of Main Street and within a few feet of the place where the shooting took place; that the policeman in uniform grabbed a man who came across the street, and, when this man broke loose from the policeman, the gun went off and Carrie sank to the gutter. Carrie was to the east of these men. The first two shots were close together and a third later. Carrie fell

at the first shot. After the third shot, witness went to the aid of Carrie.

In rebuttal, a witness by the name of Woods testified that on April 1, 1926, he was working in the Belvedere Restaurant at the corner of Sixth and Main Streets in Vincennes, and that Raymond Winnegar was also there employed. At the time of the shooting, Winneger was at the stove in the restaurant, some 35 or 40 feet from the front of the building, stirring chili, and the witness was at the time frying fish. At this point, the court said: "Mr. Prosecutor, are you getting this?" Answer, "Yes, sir." The witness then testified that, while the shooting was going on, Winnegar went to the front of the building and was called back by the witness. Thereupon, the court asked the question: "Was he outside of the store?" Answer, "No, sir, not until all the battle was over." On cross-examination, Woods testified that he did not hear the shots prior to those fired across the street from his place of business; that he came to Vincennes in 1922 from Evansville where he had resided about three months; that, prior to his working in the Belvedere Restaurant, he ran a "hamburger joint" on South Fifth Street in Vincennes, which place at that time was closed, and that his wife owned the building and the business. Again, during the cross-examination, the court questioned the witness as follows: "Had you heard before you came here that this boy had testified he was out in front and saw it all? A. Somebody told me that yesterday or the day before." "Q. You understand what you are doing, do you? A. Yes, sir." "Q. You couldn't be mistaken about this? A. I know that I am not mistaken." The cross-examination proceeded, at the close of which the court again questioned the witness as follows: "Mr. Woods, where were you born? A. Twelve miles southeast of Shawneetown, Illinois, in Gallatin County." "Q. On a farm?

A. Yes, sir." "Q. You are a native of America?
A. Yes, sir." Witness: "May I ask you one ques-
tion?" The court: "Yes, sir." Witness: "I want
to tell the men of the jury about Williamson County.
I never set my foot on the soil of Williamson County.
I ran a restaurant at Harrisburg, Illinois, Saline Coun-
ty." The court: "I don't think this ought to be let
go unpassed. This court has got all it can handle, but
this is too serious a matter. I am asking you to investi-
gate it, Mr. Prosecutor. I have no reason to doubt this
man. That is all." Counsel for appellant excepted to
the statements of the court made in the presence of the
jury, to which the court responded: "All right."

Furthermore, as mere evidence of the court's activity
during the progress of the trial, it appears that while a
witness was on the stand explaining to the jury what was
meant by "fanning a gun," that is, fixing it so that it
might be fired without using the trigger or with a light
touch of the trigger, the court interposed the question:
"Did the jury get that?" to which one of the jurors an-
swered: "Yes, sir."

In this connection, it is only fair to say there is evi-
dence in the record to the effect that Rhodes fired the
first shot mortally wounding Carrie.

In our consideration of this case, we have in mind that
erroneous rulings or remarks of a judge during the
progress of a trial do not always amount to re-
versible error, for it may affirmatively appear
from the entire record of the case that the ques-
tioned action of the court was not harmful to the
complaining party, or tended to interfere with his having
a fair trial. The verdict in this case fixed the death
penalty. The question presented is one of law, and
challenge the right of a trial judge to interfere in mat-
ters asserted to be wholly within the exclusive province
of the jury. No one will affirm the right in a trial judge,

under the well-settled law of this jurisdiction, to determine the weight of evidence which has gone to the jury, or the fact that it does or does not prove. *Newport* v. *State* (1895), 140 Ind. 299, 39 N. E. 926; *Sutherlin* v. *State* (1897), 148 Ind. 695, 48 N. E. 246; *McNulty* v. *State* (1907), 40 Ind. App. 113, 81 N. E. 109. Had the jury concluded that some one other than Rhodes fired the first shot, as was the testimony of Winneger, using a soft-nosed bullet, or that Rhodes fired only the second shot using a steel-jacketed bullet, and that the first shot killed Carrie, then a verdict in keeping with these facts, of which, as we have seen, there was evidence to support, might be expected.

When we take into consideration the entire examination—questions and answers—of both Winnegar and Woods, and the trial court's admonition to the prosecuting attorney, emphasized by the conclusion, "I have no reason to doubt this man," all within the presence and hearing of the jury, it would seem only reasonable that the jury would understand that, in the opinion of the court, the testimony of Winneger theretofore given to the jury was false. The outstanding position of a trial judge in his circuit, and his opinion as to the credit and weight which should be given the testimony of a witness, we know from experience and common knowledge, are exceedingly influential with the average juror.

At the time of sentencing appellant, the court commended counsel for the State, and for the defense as well, in the highest terms because of their splendid work exhibited in the trial of this case. Hence, we are not concerned with a case where the ingenuity of counsel on one side was obviously overreaching that of the other, making it apparent that the court should exercise discretion in submitting unobjectionable questions to a witness in the interest of a fair trial.

It is true, a trial court in any case may, within reason-

able limits, interrogate a witness if done in a manner that will not improperly influence the jury. *Colee* v. *State* (1881), 75 Ind. 511. But, in the instant case, upon a careful consideration of the entire record, we are compelled to hold that the remarks of the court made in the presence and hearing of the jury, over the objection of appellant, were material and improper and constituted prejudicial error, in that they had the effect of discrediting the witness Winneger, whose testimony, if entitled to credit, a question for the jury alone, strongly tended to support the defense of appellant to the charge preferred against him. *People* v. *Lindley* (1918), 282 Ill. 377, 381, 118 N. E. 719; *People* v. *Lurie* (1917), 276 Ill. 630, 641; *Brunker* v. *Cummins* (1892), 133 Ind. 443, 32 N. E. 732; *Kramer* v. *Northwestern Elevator Co.* (1904), 91 Minn. 346, 350, 98 N. W. 96. In *Kintner* v. *State, ex rel.* (1873), 45 Ind. 175, this court, in speaking of the remarks of the court in that case, namely, "I have serious doubts whether that witness ought not to be recognized to answer for perjury," said: "The question whether the witness was worthy of credit or not was a question for the jury, and the defendant was entitled to have that question go to them without the remarks from the court disparaging or destroying the force to be given to his testimony and showing that in the opinion of the court the witness had committed perjury. Had the court made use of the remarks in question in a formal instruction to the jury, no one could doubt, we think, as to its impropriety. We think it was equally improper for the court to make the remark when and in the manner made."

The State makes the point that the question on the remarks of the court was not properly saved, in that the appellant should have done something more than merely except. The taking of an exception was sufficient to save the question which is here

properly presented in support of his motion for a new trial under the head of irregularities in the proceedings of the court by which the defendant was prevented from having a fair trial. *Kintner* v. *State, ex rel., supra; People* v. *Lurie, supra,* pp. 638, 639; §2325 Burns 1926. *Kramer* v. *Northwestern Elevator Co., supra.*

In view of the conclusion already reached, it will be unnecessary for us to consider the remaining two causes —newly discovered evidence and verdict contrary to law—included in the motion for a new trial.

Judgment reversed, with instructions to sustain appellant's motion for a new trial and for further proceedings not inconsistent with this opinion.

The clerk of this court is directed to make and certify the usual order for the return of appellant to the custody of the sheriff of Gibson County.

Willoughby, C. J., not participating.

Martin, J., dissents with opinion.

### DISSENTING OPINION.

MARTIN, J.—No objection was made at the trial to the remarks of the judge for which this judgment is reversed. There should be fair dealing with the trial court, and, if no timely objection or request for action is made, it may be fairly assumed that the defendant did not then seriously regard the alleged misconduct. Without the appellant having requested and insisted upon some action of the trial court and without having excepted to an adverse ruling thereon, no question is properly before us.

Moreover, the questions and remarks of the court, in my opinion, did not affect the substantial rights of the defendant.

OPINION ON PETITION FOR WRIT OF CERTIORARI.

[January 20, 1930.]

PER CURIAM.—Application is made to this court in the above-entitled cause for a writ of *certiorari*. In the petition for the writ it is shown that "the original bill of exceptions" in this case contains the longhand transcript of the evidence, the objections, exceptions and rulings thereon, the irregularities of the proceedings set out and assigned in the motion as grounds for a new trial, all the instructions given by the court on its own motion, and instructions tendered by defendant and refused "as well as the instructions given at the request of the defendant."

It is further made to appear that appellant's motion for a new trial was overruled. The reasons assigned in the motion are predicated upon remarks, comments and statements made by the court during the hearing of evidence which petitioner herein has denominated "irregularities," the giving of certain instructions by the court upon its own motion, the refusal of the court to give certain instructions tendered by defendant, newly discovered evidence, verdict contrary to law, and insufficient evidence to sustain the verdict. Furthermore, that doubt has arisen in the minds of the attorneys for appellant as to whether the questions on "irregularities" of the court and the instructions can be considered by this court as they now appear in the transcript on appeal. "Wherefore, the appellant prays that a writ of *certiorari* issue from this court to the clerk of the Gibson Circuit Court commanding him to transmit within 60 days a copy of the *original bill of exceptions* to this court under certificate and seal of the Gibson Circuit Court, and that the record in this case be withdrawn and placed in the hands of the clerk of the Gibson Circuit Court for a

sufficient time to enable him to make and deliver said certified copy."

Rule 34 of the Supreme and Appellate Courts provides that "applications for *certiorari* . . . shall clearly designate the parts of the record asserted to be defective, improperly omitted, or improperly incorporated in the transcript."

As we understand the petition herein, the relief asked is not to meet any of the purposes mentioned in the above rule, but for an order requiring the clerk to copy the original bill of exceptions and certify the same to this court. If we are correct in the object intended by the writ, no purpose will be subserved by having it copied, as an original bill may be incorporated in the transcript of the record on appeal as a part thereof, regardless of "whether such original bill or copy thereof be specified in the *praecipe*." Acts 1905 p. 584, §289, as amended, Acts 1915 p. 122, §2332 Burns 1926. The longhand manuscript of the evidence and matters directly connected therewith, when put in the form of a bill of exceptions and filed in the trial court, as provided in Acts 1897 p. 244, §1, §691 Burns 1926, become a part of the record of the case in that court, but, by virtue of the above code provisions, it is made the duty of the clerk on request to embrace such bill in and certify it as a part of the transcript on appeal to the Appellate or Supreme Court without being copied. *Curless* v. *State* (1909), 172 Ind. 257, 267, 87 N. E. 129, 88 N. E. 339. It is the only original part of the record of the court below so authorized to be used. *Mitchell, Exr.*, v. *Beissenherz* (1922), 192 Ind. 587, 135 N. E. 885.

Appellant has referred to Acts 1903 p. 338, §7, §692 Burns 1926, but that section is not helpful to him, for the reason it applies alone to civil procedure. *Curless* v. *State, supra.*

Sections 691 and 2332, *supra,* are to be construed to-

gether, and, when thus considered, they clearly prescribe the procedure for making an original bill a part of the record of the trial court. According to the petition, the original bill is here, and whether it be a copy or the original is immaterial. If the evidence offered and heard in this cause, and all rulings, objections, exceptions and matters directly connected therewith, including remarks, comments and statements made by the trial court during the hearing of evidence, are included in the original bill and properly certified to this court, and there is no showing in the petition that they are not, it is sufficient as a basis for the presentation to this court for review of all questions thus saved.

In order to bring to this court for review exceptions to the giving of instructions by the court upon its own motion, or the refusal of the court to give instructions tendered, it is necessary that all of the instructions given and those refused be first made a part of the record below by a bill of exceptions, and that such bill be copied into the transcript filed in this court on appeal. *McNaught* v. *State* (1924), 194 Ind. 209, 211, 142 N. E. 418; *Palmer* v. *State* (1926), 198 Ind. 73, 78, 152 N. E. 607.

In this connection it might be well for us to remind counsel that instructions, whether given or refused, either in a civil or criminal case, have no place in an original bill of exceptions. If they be so incorporated, they will be disregarded, but their presence will not affect matters properly embraced therein. *Williams* v. *State* (1908), 170 Ind. 644, 85 N. E. 349.

Petition for writ of *certiorari* herein denied.