## DANIELS *v.* STATE

[No. 124, October Term, 1956.]

94

*Decided April 12, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON and HAMMOND, JJ., and MANLEY, J., Associate Judge of the Eighth Judicial Circuit, specially assigned.

*Charles D. Sanger, Jr.,* for the appellant.

*Stedman Prescott, Jr., Deputy Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, Alger Y. Barbee, State's Attorney for Montgomery County,* and *Leonard T. Kardy, Deputy State's Attorney,* on the brief, for the appellee.

MANLEY, J., by special assignment, delivered the opinion of the Court.

The appellant was found guilty of murder in the first degree by a jury at his trial before a three-judge court. He was sentenced to death, from which judgment and sentence he has appealed to this Court.

The indictment under which he was tried, which was returned by the Grand Jury for Montgomery County, charged that Eddie Lee Daniels, the appellant, Richard L. Simmons and James Sullivan, on April 22, 1956, feloniously, willfully and with deliberately premeditated malice aforethought did kill and murder Arthur Chyatte. A severance was granted to the other two defendants, who filed affidavits of removal, and the case as to them was removed to another county for trial. The appellant through his court-appointed attorney filed pleas in which it was alleged: (1) that he is not guilty by reason of insanity at the time of the alleged offense, (2) that he is not guilty because he is insane now, and (3) that he is not guilty. The court overruled the defendant's motion

for a directed verdict of not guilty of murder in the first degree. The jury, by its verdict rendered June 12, 1956, found the defendant sane at the time of the commission of the offense, sane at the present time, and guilty of murder in the first degree. Motions for a new trial and judgment N.O.V. were overruled by the court.

The appellant in this Court contends that certain evidence was improperly admitted, and that the trial court should have granted his motion for a directed verdict of not guilty of murder in the first degree.

Meyer Klein and his partner, Arthur Chyatte, owned and operated a business known as Quick Car Wash at 8808 Old Bladensburg Road, Silver Spring, Montgomery County, Maryland, in a building located on the west side of Old Bladensburg Road, near its intersection with Piney Branch Road. The building is approximately 120 feet long by 23 feet wide. Inside this building there is a small office along the north wall and about 10 feet from the front of the building. This office is approximately 4 feet by 10 feet in size. The entrance to it is through a door 24 inches wide facing the front of the building.

Mr. Klein testified that on Sunday, April 22, 1956, preparatory to closing for the day, he went to this office at about five minutes of two. Mr. and Mrs. Chyatte were in the office with him at about 2 o'clock, when Eddie Lee Daniels, a 28 year old colored man, who had been previously employed at the car-wash in November, 1955, for two days, appeared at the door to the office and asked Mr. Klein for 25¢ in change so that he might make a telephone call. Mr. Klein gave him the change, and Daniels left. Klein then bent over to put some money left by the customers that day in the safe, when he heard a noise. He then stood up and noticed Daniels slamming the front door of the building and in about a second or so Daniels was in front of him at the entrance to the office. Daniels said, "This is it, let's have the money". He had a small black gun in his right hand aimed at the witness. The safe is two feet wide and two feet deep and was located inside the office to the left of the entrance door. At that time, Daniels was about two feet from him and had

a white handkerchief like a pillow case covering his face up to his nose. Mr. and Mrs. Chyatte were in back of him in the office. Mr. Chyatte said, "Just a minute", and as the witness was about to bend down to give Daniels the money, he heard the gun click and a shot fired. Mr. Chyatte fell on him knocking him down. Daniels then turned the gun on the witness and said, "Let's have that money". The witness was kneeling on the floor. Daniels threw down a white cloth, like a pillow case, in which Klein put rolls of coins, and then Daniels said, "Let's have the money". Klein started putting bills in the bag and then Daniels said, "Let's have them big bills". He then pulled out another handful of money and put it in the bag, when someone knocked on the front door and looked in through the window. Daniels then picked up the bag with the money and ran to the back of the building and through the rear door. Blood from the wound in Chyatte's head was on the right side of Klein's body, including his face, hand and leg. The bag in which the money was placed was also covered with blood. Daniels ran down an embankment in the rear of the building and across a used car lot to Piney Branch Road where two negro companions were waiting for him in a green, 1952 Oldsmobile sedan. While running through the rear yard of the car-wash and across the used car lot, the appellant dropped a trench coat that he had been wearing and some of the money from the safe. When he got into the automobile, he dropped down out of sight in the back of the automobile which was driven south on Piney Branch Road toward the city of Washington, D. C. During the time that he was giving the money to Daniels, Mrs. Chyatte was moaning "You killed my friend, you killed my husband", and she hollered "Give him the money". Mr. Klein then ran out the front of the building and saw Daniels when he went down the steep embankment and ran after him screaming, but when he reached the bank he fell and lost his glasses and could not see anything that happened after that.

Mr. and Mrs. Joseph Kuntz, Jr., of Greenbelt, Md., were looking at automobiles on the used-car lot on Piney Branch Road. Mr. Kuntz was looking inside an automobile. Mrs.

Kuntz heard a noise at the top of the hill and upon looking up she saw a man running down the hill. At that time he was about thirty or forty feet from her. He continued to run, in what looked to her a crouched position, until he reached Piney Branch Road, where he got in a two-tone green Oldsmobile. She identified the appellant in the court room as the man that she saw. There were two other people in the Oldsmobile which was then in motion, and after the appellant got in the rear seat, it proceeded on Piney Branch Road toward Flower Avenue. She was about 25 feet away when he entered the automobile, and she heard Daniels say the words "I" and "kill". She then returned to the used-car lot and helped to pick up the money that had been dropped by Daniels, and which was later turned over to one of the police officers. She saw on the ground the trench coat which Daniels testified at the trial he had dropped while in flight. She went to the Silver Spring Police Station several days later and identified Daniels from six or eight pictures of different persons that had been shown to her by the police. Mr. Kuntz first saw Klein when he fell down the embankment. Klein was in a state of shock, but he told him about the shooting. Kuntz telephoned for an ambulance, using the telephone in the office at the car lot. He then went up to the car-wash building with Klein. There was no one in the building when they entered, and nothing was moved until the police arrived. He saw an unexpended (loaded) cartridge about a foot outside the office door. This cartridge was subsequently picked up by a police officer, and was admitted in evidence, over appellant's objection.

Barbara Jean Castle, who lives in College Park, was riding in an automobile which turned from Bladensburg Road into Piney Branch Road, at about 2:10 o'clock P. M. on Sunday, April 22, 1956. As the automobile proceeded down Piney Branch Road, she saw a colored man running down the hill behind the car-wash building. He was holding something in his arms. There was a white man following him, waving his arms. The colored man jumped in the back seat of a sea green Oldsmobile which was parked on the road, and which followed the car in which she was riding as it

drove along Piney Branch Road, until her car turned off the road. The license number of the Oldsmobile was AW-1475. Later at the Takoma Park Police Station she identified a car as being of the same type with the same license plates as the one that she saw.

The police officers found the live or unexpended cartridge on the mat just outside the office door; an empty or expended cartridge casing, approximately two feet inside the office; and a slug or bullet about three feet inside the office, which were admitted in evidence, over appellant's objection. A cigar box containing the money that was picked up from the ground in the rear of the car-wash and from the floor of the office, although objected to by appellant on the ground of relevancy and materiality, was also admitted, but the appellant does not contend here that this ruling of the court was erroneous.

Dr. Frank J. Broschart, the County Deputy Medical Examiner, made a preliminary examination of the deceased at the scene of the crime, and later the same day, he made a complete examination at a funeral home in Silver Spring to which the body had been removed. The cause of death was cerebral hemorrhage and exhaustion due to bullet wound through the skull. The bullet entered at the base of the skull in the mid-occipital region, and the exit was in about mid-skull two inches to the left of the mid-line. The bullet went completely through the skull, and its direction was upward, forward and to the left, at an angle of about ninety degrees from the base of the skull. There were no other contusions or wounds found.

On April 25, 1956, two officers of the District of Columbia Police Department were looking for Daniels in Washington, D. C. They were cruising in a scout car when they saw him on one of the streets of Washington, and when Daniels ran, they gave chase. One of the officers, Private Turner, abandoned the car and pursued Daniels on foot for about a mile, and finally arrested him in Capitol Heights, in Prince George's County, Md. Later Detective Sergeant Hayes, of the Metropolitan Police Department, joined him. Sergeant Hayes searched Daniels and found 30 one-dollar bills and

a wrist watch in his pocket, which Daniels said he had stolen. Some of the bills contained brown marks and were offered in evidence over objection. Daniels was taken to the Seat Pleasant Police Station, where he was turned over to the Montgomery County Police, who transported him to Rockville. He was questioned there at police headquarters by Sgt. Treadwell, in the presence of Lieut. Whalen, Capt. Linthicum, Sgt. Harding and Miss Hargitt, secretary to the Detective Bureau of Montgomery County. The questions and answers were taken in shorthand by Miss Hargitt, and a typewritten transcription thereof prepared by her which the appellant would not sign was admitted in evidence. Daniels was taken to the Quick Car Wash by the police officers where they went over the scene of the crime. The State offered evidence tending to show that all of the statements made by the appellant and his answers to questions were freely and voluntarily made by him, and were not the result of any threats or violence, or inducements or promises. In his testimony at the trial, Daniels repeated the admissions and statements that he had made to the police. He admitted that he went there to rob the Quick Car Wash but not to kill the man; that he had the gun to frighten his intended victims; that the lady ran towards him first, the man who was shot then struck him on the neck, the lady was hitting him with her pocketbook, he then struck the man on the head with the butt of the gun, the gun went off (only one shot was fired), and the man grabbed his chest, slumped back and fell on the floor inside the little office of the car-wash. He told of his hurried flight from the building after picking up the bag and the money when someone came to the front door, and of his escape in the automobile in which his two companions were waiting for him, and that he dropped his trench coat and some of the money as he ran across the lot in the rear of the building. He testified that when he was arrested he probably had some of the money obtained in the robbery in his possession; that some of it could have had blood on it; and that there was blood on the pillow case.

Dr. Jacob Morganstern, a physician whose specialty is psychiatry, and who is employed by the Department of

Mental Hygiene of the State of Maryland, and is Director of Correctional Psychiatry for the State of Maryland, was called as a witness by the appellant. Dr. Morganstern examined the appellant on May 31, 1956, at which time he made a number of psychological tests, and his diagnosis was that he had a sociopathic personality disturbance, which means that he had difficulties in adjusting to society. He has his own moral code, which means that society is governed by him the way he sees society, and not in the way society is seen by other people. However, Dr. Morganstern stated that in his opinion the appellant is not insane, that he knows the difference between right and wrong, and that he has a capacity to reason and differentiate between right and wrong, and he knows the nature and consequences of his actions.

Appellant's first assignment of error is that the trial court should not have admitted in evidence the bullet or slug, the empty cartridge casing and the loaded cartridge found at the scene of the crime. It is urged that in the absence of any evidence to connect these items with the crime or the accused, they were not material or relevant, and their admission tended to inflame the minds of the jury and cast mere suspicion on the accused. No one had entered the building where the crime had taken place before the arrival of the police, other than Mr. Kuntz, who testified that he entered the building with Mr. Klein immediately following the commission of the crime, and that everything in the building when the police arrived was just as he had found it. The police officers found all three of the objects within a few feet of the body and the position occupied by appellant during the commission of the crime.

This Court has consistently held in many cases that evidence need not be positively connected with the accused or the crime committed in order to render it admissible, and that if there is a probability of its connection with the accused or the crime, then it is admissible. A lack of positive identification affects the weight of the evidence rather than its admissibility. Typical of these cases are the following:

*Goldstein v. State,* 179 Md. 697 (unreported), 22 A. 2d 471. A burglary had been committed and the defendants

were followed by police officers in the nighttime in a radio car. As the car overtook them, the men turned towards an open lot and threw something to the ground. After the men had been arrested and placed in the car, one officer looked on the lot, about five feet away, and found a pair of brown cotton gloves and a set of approximately twelve skeleton keys. This Court held that the gloves and keys were properly admitted in evidence. In *Wilson v. State,* 181 Md. 1, 26 A. 2d 770, a small box and tube marked "Luenbach's Paste" found by the county investigator in a waste basket in a doctor's office on the morning of his arrest and a few hours after a miscarriage, were admitted in a prosecution against the doctor for abortion. *Smith v. State,* 182 Md. 176, 32 A. 2d 863, was a murder prosecution. The testimony of the medical examiner who performed the autopsy was that the fatal wounds were inflicted by a sharp instrument and could have been inflicted by the hatchet or axes offered in evidence. The uncontradicted evidence was that the body was buried in a grave dug in a cement cellar. It was held that a pick, shovel, hatchet and axes found on the premises occupied by the appellant or in the cellar where the body of his wife was buried, were properly admitted in evidence even though there was no proof positively identifying these instruments as having been used in the commission of the crime. In *Purviance v. State,* 185 Md. 189, 44 A. 2d 474, the defendant, upon the approach of two police officers, ran around the corner and was seen reaching into his overcoat pocket. The officers observed him walking away from a fence, on the other side of which they found a number of dry lottery tickets on the snow. Although the defendant was not seen actually to throw the lottery tickets where they were found, it was held that his actions and his statements as to why he went near the fence which was convincingly contradicted, amounted to probability that he had the lottery tickets in his possession, the weight of the evidence being a question for the jury. In *Cox v. State,* 192 Md. 525, 64 A. 2d 732, an automatic revolver and a box of shells which were taken from the home of the defendant's brother were admitted in evidence. The F. B. I. report showed the department was unable to determine that the

bullet found in the body of the deceased had been fired from the recovered revolver, although the bullet was from a gun of the same caliber as the gun recovered, and in his confession the defendant admitted that he took the gun to the place where it was found and identified it as the gun with which the deceased was killed. In *Edwards v. State,* 198 Md. 132, 140, 81 A. 2d 631, 83 A. 2d 578, a cartridge case found where the body of one of the murdered persons had lain, six days after the bodies had been discovered, was admitted. In *Hayette v. State,* 199 Md. 140, 85 A. 2d 790, old number slips found in a cardboard box and an oil tank, which contained trash, in appellant's back yard, were admitted. *Berry v. State,* 202 Md. 62, 95 A. 2d 319. Lottery paraphernalia found in an apartment were admitted, where there was testimony of frequent appearances of the defendant while the tenants of that and another apartment were at work, and defendant had possession of a key to both apartments. In *Watson v. State,* 208 Md. 210, 117 A. 2d 549, an infanticide prosecution, it was held the circumstances of the case justified admission in evidence of the finding of an infant body in the harbor, notwithstanding that it was not proved to a certainty that such body was that of the baby alleged to have been murdered.

In the instant case, Daniels testified that he had the gun (a .32 automatic) in his hip pocket when he went to a parking lot where he met the other two men and split the money. He took the gun out of his pocket and put it on the sidewalk, but ran away without the gun when he heard someone walking up the street. The police were unable to locate the gun, and it was, therefore, impossible to check the slug and casing to determine if they came from the weapon used to do the killing. There was only one shot fired, and the bullet went all the way through the victim's head. The presence of the slug and casing at the scene of the crime immediately after its occurrence, creates a very strong probability that they were from the gun used by Daniels, and the probability here under these circumstances is little short of certainty. The loaded cartridge was found outside the office door where the appellant was standing at the time of the shooting. In his

statement to the police, Daniels stated that the gun jammed, and in his testimony he admitted that he had given the gun to Sullivan in the automobile and told him that it was jammed. The fact that the gun did become jammed after the first shot was fired would create a probability that the live cartridge fell to the floor as a result of the jamming of the gun.

The appellant's next point is that the trial court erroneously admitted in evidence over his objection the thirty one-dollar bills taken from him at the time of his arrest. Before the money was introduced in evidence, the State had proved by Sergeant Hayes that when he took the money from him, on the third day after the crime, the appellant stated that he had stolen it. This evidence, therefore, had a natural tendency to connect the appellant with the robbery. Recent possession of stolen goods is evidence of guilt of the possessor and casts on him the burden of giving a reasonable explanation of how it came into his possession. *Debinski v. State,* 194 Md. 355, 71 A. 2d 460.

We repeat what we previously said that if there is a probability that there is a connection between the evidence and the crime, it is admissible, and the extent of its connection is a matter for the determination of the jury. "The real test of admissibility is the connection of the fact proved with the offense charged, as evidence which has a natural tendency to establish the fact at issue should be admitted." *Hitzelberger v. State,* 174 Md. 152, 161, 197 A. 605, 609. Appellant denied on the witness stand that he told the police officer that he had stolen the money, but he admitted that he probably had in his possession four or five dollars of the car-wash money, and claimed that he had won the balance of it in a crap game.

Appellant also charges prejudicial error in certain remarks made by the court regarding "blood" on the bills during the following colloquy between the court and counsel:

"(Judge Prescott) I understand there are certain other things about the money. I understood Mr. Barbee, in his opening statement, to make remarks about being blood on the money and so forth.

"(Mr. Sanger) I object to the introduction of it as being

irrelevant; on the state of the record it is not competent as evidence against the defendant.

"(Judge Prescott) I assume that your statement in your opening statement is correct, there is blood on the money.

"(Mr. Barbee) I made that statement and I believe an examination of these bills will show that.

"(Judge Prescott) The objection is overruled.

"Q. Sergeant, you said those are in the same condition now as when you received them; can you point out anything in connection with those bills that we might see as unusual?

"A. Yes, sir, I can.

"(Judge Prescott) Just let the jury examine them. Take the ones you feel are pertinent and let the jury examine them.

"(Mr. Barbee) That is pretty hard to see. Can you point it out, Sergeant?

"(Mr. Sanger) I make an objection to that, Your Honor; I don't believe the Sergeant is qualified in the first place to make such a conclusion.

"(Judge Prescott) Just let him hand you the ones you want to show the jury.

"(Mr. Barbee) Will you hand me the ones that have a brown substance on them, Sergeant.

"(Mr. Barbee) May I show this one to the jury?

"(Mr. Sanger) Did you overrule my objection to that, Your Honor?

"(Judge Prescott) We understand you object to it. If the Court understands correctly, you contend that is blood, and it is up to the jury to determine that. Have you had any analysis made of it?

"(Mr. Barbee) The man who had this is not in this vicinity.

"(Mr. Sanger) I object to the State's Attorney testifying.

"(Mr. Barbee) I am answering the Judge's question.

"(Judge Prescott) As I see, you are not going to offer any analysis to prove it is human blood; it is just up to the jury to determine it.

"(Mr. Barbee) That is correct."

The objection was based on relevancy and that the witness (Sergeant Treadwell) was not qualified to express an opinion

that the substance on the money was blood. The court did not permit the police officer to testify that the brown spots on the money were blood, but left that for the jury to determine from its own observation. The argument is made that the jury may have been influenced by the court's remarks to conclude that what was on the money was human blood.

There was no objection or exception to the court's remarks. By failing to object, the attention of the court was not called to any possible implication derogatory to the accused which might well have been corrected. *Brown v. State,* 203 Md. 126, 100 A. 2d 7. If accused desires to complain of an alleged impropriety of a remark made by the court during his trial, he should either move to strike it or move to withdraw a juror and declare a mistrial. *Bryant v. State,* 207 Md. 565, 585, 115 A. 2d 502. Even if the matter was properly before us, the record does not give us any reason to believe that the court exceeded the limits of proper judicial discretion. It developed that no analysis would be offered to prove that the substance on the money was human blood, and the court merely stated that it would be up to the jury to determine for itself what the substance was. Special qualification is not required upon the question of whether a stain is blood. *Smith v. State, supra.*

The two cases relied on by the appellant are not controlling. In *Apple v. State,* 190 Md. 661, 59 A. 2d 509, certain occurrences during the trial indicated that the court was irritated or annoyed by appellant's counsel, but this Court found that the defendant was not prejudiced. In the other case of *Rhodes v. State,* 202 Ind. 159, 171 N. E. 301, 172 N. E. 176, the court stated that erroneous rulings or remarks of the judge during the progress of a trial do not always amount to reversible error, for it may affirmatively appear from the entire record of the case that the questioned action of the court was not harmful to the complaining party, or tended to interfere with his having a fair trial. In that case, the trial court stated that testimony in rebuttal had the effect of discrediting a witness for the defense. This clearly was prejudicial error because the court invaded the right of the jury to determine the weight or the probative force of the evidence,

106

and the appellate court so held. There was no interference with the function of the jury in the instant case.

The appellant himself testified on cross-examination, without objection, that some of the money could have had Mr. Chyatte's blood on it, and that there was blood on the pillow case which had the money in it. Even if there had been error in admitting this money in evidence, or in the remarks of the court, the error, if any, was cured or rendered harmless by these admissions. *Damm v. State,* 128 Md. 665, 669, 97 A. 645; *Mazer v. State,* 179 Md. 293, 304, 18 A. 2d 217; *Barber v. State,* 191 Md. 555, 566, 62 A. 2d 616; *Madison v. State,* 200 Md. 1, 8, 87 A. 2d 593; *Chisley v. State,* 202 Md. 87, 104, 95 A. 2d 577.

Appellant also contends that the failure of the court to rule on his motion to strike certain testimony of Sergeant Treadwell was erroneous and highly prejudicial. The answer of the witness was responsive to a question propounded by Mr. Sanger on cross-examination. This same evidence subsequently came in without objection. In the absence of a ruling by the trial court, there is nothing for this Court to review and no basis for the contention that the trial court committed reversible error. *Niemoth v. State,* 160 Md. 544, 154 A. 66; *State Roads Commission v. Berry,* 208 Md. 461, 118 A. 2d 649, and cases cited.

The final assignment of error is that the evidence in this case was not legally sufficient to justify its submission to the jury, and that the trial court erred in overruling appellant's motion for a directed verdict of not guilty of murder in the first degree. One of the reasons urged in support of this contention is that the prosecution did not produce positive and direct evidence which it is alleged by appellant it had within its knowledge and under its control, in that the State did not call as a witness, Mrs. Chyatte, the widow of the murdered man, who was present on the scene at the time of the crime. No authorities are cited by appellant to show that it was obligatory on the prosecution to call Mrs. Chyatte.

The common law rule was that the prosecution was required to place all eyewitnesses on the stand in homicide cases. The reason for the rule was that the accused could not

as a matter of right demand compulsory process for his witnesses. Since the reason for the rule no longer exists, it is generally held that it is not necessary for the State to examine all of those who have knowledge of the crime. *Warren on Homicide,* Vol. 3, Sec. 304, page 497; 41 *C. J. S., Homicide,* Sec. 337, page 96; *State v. Parr,* 296 Mo. 406, 246 S. W. 903; *Mitchell v. State,* 171 Miss. 4, 156 So. 654; *Dillon v. State,* 137 Wis. 655, 119 N. W. 352. No explanation appears in the record to account for the absence of Mrs. Chyatte. Cf. *Lenoir v. State,* 197 Md. 495, 80 A. 2d 3. However, we have no way of knowing what her testimony would be, or whether due to the excitement she would have been able to testify to any of the details of the killing of her husband. In *Jackson v. State* (Tex. Cr. App.), 24 S. W. 896, it was held that the trial court properly denied the defendant's motion that the District Attorney be required to call as a witness for the State the widow of the deceased, who was an eyewitness to the homicide.

In the instant case, this point was not made in the court below, and it does not appear that any effort was made by the appellant to secure the attendance of Mrs. Chyatte, or to require the State to call her as a witness or explain her absence. There is, therefore, no ruling of the trial court to be reviewed.

The argument is advanced by the appellant that considering the positions of the parties in the crowded office, if a bullet did come from appellant's gun, that bullet could not have struck the victim and caused the wound described by the medical examiner. If the bullet from appellant's gun caused Chyatte's death, then there is an abundance of evidence to justify the verdict of murder in the first degree. The testimony produced by the State places appellant at the scene of the crime and tends to establish that the killing occurred during an armed robbery. Appellant's testimony corroborates it. The verdict, therefore, would seem to be a proper one under Art. 27, Sec. 497 of the Annotated Code of Maryland (1951 Ed.) which provides that "All murder which shall be committed in the perpetration of, or attempt to

perpetrate, * * * robbery * * * shall be murder in the first degree."

The next inquiry is whether there was sufficient evidence before the jury from which it could conclude that the bullet from appellant's gun killed Chyatte. The Court of Appeals has the constitutional authority to pass upon the sufficiency of the evidence to sustain a conviction in a criminal case tried before a jury. However, it has been held that this Court "will not inquire into or measure the weight of the evidence, and will not reverse the judgment if there is any proper evidence before the jury on which to sustain a conviction." *Shelton v. State,* 198 Md. 405, 84 A. 2d 76. We said on the motion for re-argument in *Edwards v. State, supra,* (a non-jury case) that "In any case, civil or criminal, to meet the test of legal sufficiency, evidence (if believed) must either show directly, or support a rational inference of, the fact to be proved. * * * In a criminal case the fact must be shown, or the inference supported, beyond a reasonable doubt or to a moral certainty, or a reasonable doubt of an opposite fact must be created. The difference in degree of proof is ordinarily for the triers of facts."

The latitude allowed the jury in passing on the weight of the evidence is clearly illustrated in the case of *Madison v. State, supra,* in which Judge Markell said: "We do not, however, accept defendant's contention that when an unarmed storekeeper is seen 'tussling' in his store with another man, with no one else present, and a short time later is shot and killed (intentionally or unintentionally) by the other man, a jury is bound to accept defendant's version of the visit to the store and the shooting and cannot infer that the purpose and attempt of the armed man was robbery."

The State was not required to prove the exact position of the victim, or of the gun in the hand of the perpetrator of the crime *at the time the shot was fired,* or to prove to a mathematical certainty that they were in such positions that the bullet must necessarily have entered the victim's head at a certain place and have gone through his skull in the direction and at the angle indicated by the autopsy. Where there is evidence such as that produced in this case, that there was

only one shot fired which came from appellant's gun, in this group of four persons in close proximity to each other, and one member of the group immediately fell bleeding from a bullet hole in his head, we are of the opinion that reasonable persons could conclude from such evidence that the victim was struck by the one bullet that was fired. The appellant in his statement to the police, said that when the gun went off, the man "grabbed his chest and went 'Ich' (demonstrating), slumped back, and fell on the floor inside the little office of the car-wash." If there is any proper evidence before the jury on which to sustain a conviction, a motion for a directed verdict should not be granted. The court in a jury case can only pass on the sufficiency of the evidence to prove the fact; the weight of the evidence, or whether the State has proved its case beyond a reasonable doubt, are matters to be determined by the jury. *Yanch v. State,* 201 Md. 296, 300-301, 93 A. 2d 749; *Chisley v. State, supra.* The action of the court in overruling the appellant's motion for a directed verdict was correct.

Defendant had a fair trial. There was no error in any of the rulings of the court, and the judgment of conviction is affirmed.

*Judgment affirmed, without costs.*