## Case No. 15,009.

### UNITED STATES v. DURKEE.

[1 McAll. 196.] [1]

Circuit Court, N. D. California. July Term, 1856.

LARCENY—REQUISITES—INTENT TO APPROPRIATE—PIRACY.

1. The essential requisite of larceny is the lucri causa. *Held*, if the prisoner took and carried away the muskets with intent to appropriate any of them to his own use, or permanently to deprive the owner of them, such taking is larceny.

[Cited in dissenting opinion in People v. Raschke, 73 Cal. 385, 15 Pac. 16; State v. Slingerland, 19 Nev. 135, 7 Pac. 283.]

2. If the taking was with the sole intent to prevent the use of them upon himself or his associates, it is not larceny.

[Cited in Gooch v. State, 60 Ark. 5, 28 S. W. 511.]

This was a case of an indictment [against John L. Durkee] under the 3d section of the act of May 15, 1820 (3 Stat. 600). It arose out of the movements of a body of men known as the "Vigilance Committee," in the city of San Francisco, during the excitement which existed in that city during the summer of 1856. The prisoner was charged with being concerned in making an assault upon a vessel on her way from Sacramento to San Francisco, with arms on board, the property of the state, and carrying them off from those to whom the transportation of them had been confided by the authorities.

William Blanding, U. S. Dist. Atty.

I. B. Crockett and Wm. Duer, for defendant.

McALLISTER, Circuit Judge (charging jury). We approach, we trust, the termination of this case with the single desire to dispense evenhanded justice between the parties. Each of you, placed upon that panel, has called upon his God to witness that he has neither bias nor prejudice in this case. As for myself, though it is my sworn duty to convict him whom the law condemns; yet to convict improperly under the forms of law would fill me with horror as great as if I were to take into my own hands the issues of life and death, and send down to the grave my fellow-creature without the forms, the guards, and the sanctions which the constitution, the laws, and humanity have thrown around him. Animated by this sentiment, I proceed to state to you the law which, in the opinion of this court, must control your action. In order to fix your attention on the only issue you are sworn to try, it is necessary to separate it from all collateral considerations. The defense is rested upon the ground that, in seizing the arms for the taking of which the prisoner has been indicted, he was acting in obedience to the orders of a body which we charge you was unauthorized by and banded together in violation and defiance of the laws. It is our duty to say to you

that no orders emanating from such a source can vary the character of the act charged against the prisoner, if it be established that he is guilty of it under the law and testimony in this case.

Again, gentlemen, the prisoner may have been guilty of a crime or crimes other than that for which he is indicted; he may, in what he has done, have acted with those who deserve execration as unfeeling violators of the laws of their country, or merit approbation as patriotic citizens. In a word, he may have transgressed every precept of the moral or municipal law. Those, and all other like considerations, must be dismissed from your minds. He is on trial for a single offense,—piracy. Any other crime he may have committed; but if you shall find he is innocent of the one now charged against him, he must go free. This is demanded by an immutable principle of justice. No man can be held responsible for an act unless, after having been confronted with his accuser and an impartial trial had, he has been found guilty; and then his responsibility must be confined to the specific crime that has been proved against him. This is a right guaranteed even to a malefactor. It has been truly said by a distinguished author that, "the law withdraws its protection from a malefactor while actually engaged in illegal acts; but at any other moment, it protects his person and property as impartially as it does yours or mine. For instance, if a burglar breaks into my house, I may then and there cut him down like a dog. If a pickpocket puts his hand into my pocket, I may knock him down. But if I break into a notorious felon's house, and rob him, I am just as great a felon in the law's eye as if I so robbed an honest citizen; and so, if I attack a burglar's or a pickpocket's person and life at any moment when he is not feloniously engaged, I am none the less a villain in the law's clear eye because my villainy is aimed at an habitual villain. And here the law is not only just but expedient; for were such fatal partialities admitted, we should soon advance from doing acts of villainy upon villains to calling any one a villain whom we wished to wrong, and then wronging him." Thus vigilant and just is law; it views every man before judgment innocent, so far as affording him an opportunity to defend himself surrounded by those guards which the law has prescribed. To deal differently with an accused party, would violate alike the precepts of municipal law and the dictates of natural justice. We repeat, then, your duty is to limit your attention to the single inquiry whether the prisoner is guilty or not of the specific crime for which he is indicted.

The indictment is founded upon the 3d section of the act of May 15, 1820 (3 Stat. 600). So much of it as is necessary to be considered is in the following words: "That if any person shall upon the high seas, or in any open roadstead, or in any haven, basin, or bay, or in any river where the sea ebbs

[1] [Reported by Cutler McAllister, Esq.]

and flows, commit the crime of robbery in and upon any ship or vessel, or upon any of the ship's company of any ship or vessel, or the lading thereof, such person shall be adjudged to be a pirate, and being thereof convicted before the circuit court of the United States for the district into which he shall be brought or in which he shall be found, shall suffer death." The power of congress thus to legislate, is derived from that clause in the constitution which declares, that the judicial power shall extend to "all cases of admiralty and maritime jurisdiction." Originally, the states had exclusive jurisdiction of all crimes committed within the limits of their respective counties. Then came the clause in the constitution referred to. In relation to this, the supreme court of the United States have said, "It is not questioned, that whatever may be necessary to the full and unlimited exercise of admiralty and maritime jurisdiction is in the government of the Union. Congress may pass all laws which are necessary and proper for giving the most complete effect to this power." U. S. v. Bevans, 3 Wheat. [16 U. S.] 388. The legislation of congress prior to the passing of the act under consideration, has been limited in its enactments to offenses committed on the high seas, and to places the exclusive jurisdiction over which had been ceded to the general government. Finding it necessary and proper, in order to carry out fully the power vested in them in all cases of admiralty and maritime jurisdiction, congress passed the act under which this indictment is framed; which, while it accomplishes the contemplated object, impinges no further upon the jurisdiction of the states than was absolutely necessary to achieve the object which, under the grant by the constitution, it was in their power to effect. The proviso to the act declares, "that nothing in this section contained shall be so construed as to deprive any particular state of its jurisdiction over such offenses when committed within the body of a county; or authorize the courts of the United States to try any such offenses after conviction or acquittance for the same offense in a state court." The jurisdiction of the federal and state judiciary is therefore concurrent in this case, and the familiar principle intervenes, that where there are concurrent jurisdictions the one who first obtains possession of the case must exert it. In the exercise of this jurisdiction, the court has no unwritten criminal code to which it can resort as a source of jurisdiction; nor can it look to the common law, further than as a guide in its exercise of the jurisdiction conferred upon it expressly by statute. The legislative authority must first make an act a crime, affix a punishment to it, and declare the court that shall have jurisdiction of the offense, before cognizance can be taken of it. U. S. v. Hudson, 7 Cranch [11 U. S.] 32. The act on

which this indictment is founded declares, robbery committed on the high seas and in certain places shall be deemed to be piracy. To become a pirate under this law, a man must have committed robbery. Of the meaning of the term "robbery," we think there can be no doubt. It must be understood as it was recognized and defined to be at common law. Although the common law is not a source of jurisdiction in the courts of the United States, it is necessarily referred to for the definition and application of terms.

The only inquiry, then, is, what was robbery at common law at the time of the separation of the American colonies from the parent country? U. S. v. Palmer, 3 Wheat. [16 U. S.] 610. In robbery, which is larceny accompanied by intimidation or force, the felonious intent in taking constitutes the offense. Blackstone tells us, the taking and carrying away must be done animo furandi, or, as the civil law expresses it, lucri causa. Lord Coke, in his Institutes, and Hawkins, in his Pleas of the Crown, give the same definition. 1 Hawk. P. C. 93. Archbold states that "larceny, as far as respects the intent with which it is committed, is where a man knowingly takes and carries away the goods of another without any claim or pretense of right, with intent wholly to deprive the owner of them and to appropriate or convert them to his own use." In Pear's Case, East, P. C. tit. "Larceny," § 2, Baron Eyre defines larceny to be "the wrongful taking of goods with intent to spoil the owner of them causa lucri." The foregoing authorities all include in larceny, as an essential element, what is termed the lucri causa. A similar view is taken by the supreme court of Missouri in the case of State v. Conway, 18 Mo. 321. "The taking (say the court) must be done animo furandi, or, as the civil law terms it, the lucri causa. The felonious intent is the material ingredient in the offense." To constitute this offense, therefore, in any form, there must be a taking from the possession, a carrying away against the will of the owner, and a felonious intent to convert it to the offender's use. Again, in the state of Delaware it was ruled, that if the party indicted for larceny, where he took a horse for the stealing of which he was indicted, intended to appropriate him to his own use, by selling or retaining him to his own use. it was felony; but if he only took him to aid him in his escape as a runaway slave, it was no more than a trespass. 2 Har. 529. In Alabama, the supreme court considered the doctrine at common law to be "that the criminal intention constitutes the offense, and is the only criterion to distinguish a larceny from a trespass. That, according to the common-law writers, to constitute the offense of larceny it was not sufficient that the goods be taken for the purpose of destroying them to injure his neighbor, and actually destroying

them. Such offense would be malicious mischief; but it would want one of the essential ingredients of larceny—the lucri causa—the intention to profit by the act by the conversion of the property." State v. Hawkins, 8 Port. (Ala.) 461. In that case, although it was evident the prisoner had secreted the slave from her owner with a view to do the owner an injury by aiding the slave to obtain her freedom, still, as there was no intention to convert the slave to his own use, the party was held to be not guilty of larceny. The courts, then, of Missouri, of Delaware, and of Alabama, in the three cases cited, consider the doctrine of the common law to be, that to constitute larceny there must be, as an essential ingredient and a necessary element, the animus furandi or lucri causa. There are decided cases in England which sustain a similar doctrine. Thus, in Rex v. Holloway, 5 Car. & P. 524, decided in 1833, the prisoner was indicted for stealing a gun from the prosecutor, who was a game-keeper. The latter, knowing him to be a poacher, seized him. A companion of the prisoner rescued him; and the latter, getting free, wrenched the gun from the prosecutor and ran off with it. It was proved that the prisoner said he would sell the gun, and it was not afterwards found. The jury returned that they did not think that the prisoner, at the time he took the gun, had any intention of appropriating it to his own use. "Then (said the court) you must acquit him. It is a question peculiarly for your consideration. If he did not, when he took it, intend its appropriation, it is not felony; and his resolving afterwards to dispose of it, will not make it such." In Rex v. Crump, 1 Car. & P. 658, the prisoner was indicted for stealing a horse, three bridles, two saddles, and a bag; and the court left it to the jury to say whether the prisoner intended to steal the horse; for if he intended to steal the articles, and only to use the horse to convey the articles away, he would not be guilty of stealing the horse. The case of Rex v. Wright, 1 Burrows, 543, was that of a servant indicted for stealing his master's plate; and it appeared that, after the plate was missed but before complaint was made, the prisoner replaced it. It was in proof that the plate had been pawned, and the pawnbroker testified that the prisoner had, on previous occasions, pawned plate and redeemed it. The court left it to the jury to say, whether the prisoner took the plate with intent to steal it, or to raise money on it and then return it; for in the latter case it was no larceny. The prisoner was acquitted. In Rex v. Van Muyen, 1 Russ. & R. 118, the prisoner, who was master of a Prussian vessel captured by the British and carried into a home port, was indicted for stealing certain articles from the ship. There was no evidence to prove whether the prisoner had taken the articles for his own use or that of his owners. Chambers, J., reserved the point for the opinion of the judges; and a majority of them were of the opinion that if the prisoner had taken the articles for his own use, it was larceny, otherwise it was not. In Reg. v. Godfrey, 8 Car. & P. 563, it was decided, that where a person from curiosity, either personal or political, opens a letter addressed to another person, and keeps the letter (this in the absence of a statute), it is a trespass, not a larceny, even though a part of his object may be to prevent the letter from reaching its destination.

The foregoing decisions embody, in a practical form, the principle enunciated in the definitions given by the text-writers. We will now advert to three or four recent English decisions, which seem to qualify the doctrine. In the year 1815, two decisions were made in England, which were subsequently followed by two others, without comment or discussion. The first is that of Rex v. Cabbage, 1 Russ & R. 292. The principle enunciated was, "that if the intent be to destroy the article taken, it will be sufficient to constitute the offence of larceny, if done to serve the prisoner or any other person, though not in a pecuniary way." The case was this: The prisoner, to screen his accomplice, who was indicted for stealing a horse, broke into the prosecutor's stable and took away the horse, which he backed into a coal pit and killed. A majority of the judges decided this was larceny. At such a decision we are not surprised to find Lord Abingdon exclaiming, in 1838, when that case was cited in his presence, "I cannot accede to that!" The second English case on this point, is Rex v. Morfit, 1 Russ. & R. 307, decided on the authority of the former. There, A and B, servants, opened the granary of their master by means of a false key, and took two bushels of beans to give to their master's horses, in addition to the quantity allowed; and it was held to be larceny. Some of the judges alleged that the additional quantity of beans would diminish the work of the men who had to look after the horses, and this diminution in their labor was considered a lucri causa. The astuteness with which the lucri causa was sought for and discovered in that case, is strong proof of the stringency of the rule which requires it as an essential ingredient in the crime of larceny. This case is referred to by a recent writer as a "singular case on this point." Archb. Cr. Law (Ed. 1853.) Such it undoubtedly is; as in effect it destroyed the distinction which had existed from an ancient period between larceny and trespass, unless we can, with some of the judges, detect the existence of the lucri causa in that case. Looking into the cases last cited, and the grounds on which they were decided, we deem the observations made in relation to them by the supreme court of Alabama, not

inappropriate. "It appears to us (they say) that these cases cannot be considered authority in this country. The shadowy and almost imaginary distinctions upon which they rest, are at war with that precision and certainty which are the boast of the criminal law of England." 8 Port. 465. These cases stand in direct opposition to the numerous authorities, English and American, above cited. They introduced a change into the common law as it existed at the time of the emigration of our ancestors to this country; and we cannot recognize modifications recently made in the common law of England, as controlling this court. If an authority could have been found emanating from an American court, adopting these hair-breadth distinctions, it certainly could not have eluded the search of the profession.

After a careful examination of the law, we give you, gentlemen, the instructions which follow: 1. That if you believe, from the evidence, that the prisoner took and carried away the arms, with the intent to appropriate them, or any portion of them, to his own use, or permanently deprive the owner of the same, then he is guilty. 2. But if you shall believe that he did not take the arms for the purpose of appropriating them, or any part thereof to his own use, and only for the purpose of preventing their being used on himself or his associates, then the prisoner is not guilty.

Verdict, "Not guilty."