MILLARD KEITH, and BONARD RETHERFORD, v. STATE.
163 So. 136.
Opinion Filed September 17, 1935.

*E. C. Boswell* (Geneva, Ala.) for Plaintiffs in Error;

*Cary D. Landis,* Attorney General, and *Roy Campbell* and *Robert J. Pleus,* Assistants, for the State.

DAVIS, J.—Millard Keith, 18 years of age, and Bonard Retherford, 20 years of age, were convicted of kidnaping with intent to hold for ransom and were sentenced to suffer death therefor as provided by Chapter 16063, Acts 1933, Laws of Florida, when the trial jury fails to recommend mercy, as was the result below in this case. The statute under which the conviction was obtained was construed and upheld as constitutional in our recent decision in Finch v. State, 116 Fla. 437, 156 Sou. Rep. 489.

The evidence shows that the two plaintiffs in error, Millard Keith and Bonard Retherford, in company with a third party, went to the home of the prosecutrix, Mrs. Sophia Phelps, a 77-year-old lady, who lived near Bonifay in Holmes County. At the time thereof they were armed with a pistol, rifle, shot gun and flashlight. By a ruse, Millard Keith gained entrance to the old lady's home, whereupon he and his companions in crime attempted by beating the old lady with a pistol butt and by slapping her face, to have her turn money over to them that they suspected her of keeping in a large amount about her place of residence. The old lady refused to give the intended robbers any money, telling them that all of the money she had was in the banks of two neighboring towns. Finally they seized and took the old lady out of the house and, putting her in their car, drove away with her to a remote and secluded spot near a place designated as Cheney's Pond.

While the criminal acts of the defendants were being committed inside the Phelps house, a third member of the bandit party was stationed outside the premises to act as a sentry to give warning of the approach of possible interference with the execution of the crime therein being at-

tempted. This third member of the gang had halted a Mr. and Mrs. Bailey, passersby, and in order to prevent their giving any alarm concerning what was about to be done to Mrs. Phelps, the gang seized and abducted them also. As a result there was a transportation of the two Baileys together with Mrs. Phelps, principal victim of the outrage, to a lonely spot in Holmes County known as Cheney's Pond situate about 15 miles away from the scene of the abduction.

When the isolated destination had been reached, the Baileys were separated from Mrs. Phelps and led off down the road. There they were forcibly detained by the defendant, Bonard Retherford, until daylight. At break of dawn Mr. and Mrs. Bailey were set free.

As to what happened to Mrs. Phelps at the place of detention there is conflict in the testimony. However, the abductors and abducted did not remain there long, because, failing to get any money from Mrs. Phelps, and being evidently convinced that nothing further was to be gained from longer detention of their victim, two of the three men originally involved in the original venture, conveyed Mrs. Phelps back to her home.

As to what occurred just before this return trip, Mrs. Phelps testified as follows:

"I told them I did have a little there, but it wasn't any account, and they asked me if I wouldn't give it to them, and I told them that I would give them what I had, but it wouldn't do them no good, it wasn't no account. They didn't ask me how much I had. I told them the last time I saw it, it was about twelve hundred dollars. I told them it wasn't any good. I told them it was back in the Revolutionary days, old time Revolutionary money, and it was no good, but they said they would take that, and I said I would turn it over to them; they told me if I would turn it over to

them they would carry me back to the house, and they wouldn't molest me any more, provided I wouldn't tell nobody that night or the next day, and by the next night they would be in Chicago. I didn't tell them where it was. I told them if they would take me home I would turn over what little I had."

Whether the two boys who carried Mrs. Phelps back to her home did so as an act of partial repentance for the heinous and outrageous acts they had perpetrated on this old lady by threatening her and beating her prior to that time, or whether they went back with her in the belief that they could compel her to reveal the hiding place of her money as the price for her release, is a matter of conjecture from the evidence. The boys did take the old lady back to the vicinity of the Phelps home, but when they perceived that a large crowd of excited people gathered there, they immediately abandoned the automobile in which they were riding, leaving the injured, bruised and terrified Mrs. Phelps seated in it.

The divers criminal acts committed occurred at a time ranging between 9:00 and 10:00 o'clock at night. The old lady was returned to her home between 12:00 and 12:15 o'clock thereafter.

In our recent opinion in the case of Finch v. State, *supra*, we were called upon to construe Chapter 16063, Acts 1933, denouncing as a capital crime the felony of kidnaping for ransom. In that case, in discussing the meaning, intent and purpose of the statute in question, we held as follows:

"By Chapter 16063, Acts of 1933, the kidnaping of a person to hold for ransom is made a capital felony. And under that statute the specific intent to hold for a ransom to be paid for the release of the victim is the gist of the offense. It is clear that in raising the nature of the crime denounced

to one of a capital character the Legislature did not intend to punish with death every unlawful restraint or imprisonment of another, however revolting the cirumstances of the unlawful restraint or imprisonment might be, but only that particular kind of secret confinement, imprisonment, inveiglement, or kidnaping which should be done 'with intent to hold such person for a ransom to be paid for the release of such person.' Ross v. State, 15 Fla. 55; 35 C. J. 904, par. 5.

"The 1933 Act was intended to reach and exterminate, through capital punishment a predatory class of organized criminals that had excited national attention by seizing persons of wealth, reputation or means and holding them captive until an exorbitant money demand or pecuniary reward in the form of a ransom has been paid by the victim, his friends or relatives as a condition precedent to his being released. The statute is to be construed in the light of its contemparary historical background, when determining what is meant by the word 'Ransom' as employed in the statute in connection with the phrase 'Hold such person for a ransom to be paid for (his) release.' "

In the present case the issue was sharply drawn at the trial whether or not the alleged kidnaping was a forcible and outrageous attempt at and the commission of, the crime of armed robbery followed by abduction for the purpose of further robbery, or whether the defendants had kidnaped Mrs. Phelps without lawful authority and thereafter forcibly confined and imprisoned her at a lonely spot in the woods with intent to hold her for a ransom to be paid for her release and return to her home.

The two defendants on trial were minors, one being 18 years of age and the other barely 20. From the testimony adduced before the jury it is plain that there was both an

attempt at armed robbery as well as an armed robbery of Mrs. Phelps, accompanied by assaults on her with a deadly weapon. It is also plain from the evidence that Mrs. Phelps was kidnaped in the sense that she was forcibly seized and carried away into the woods. But there is also evidence that the victim was thereafter voluntarily released and returned to her home without any actual exaction of any sum of money or other thing of value therefor, just as was the case of Mr. and Mrs. Bailey who appear to have been kidnaped largely to suppress their giving an alarm in the matter.

Under the Florida statute, the seizure and carrying away or kidnaping of a victim with intent, and for the purpose of, committing robbery, mayhem, or other specific felonies against the person of the victim, is not within the scope of the capital crime defined by Chapter 16063, *supra*. This statute, unlike the statutes of many states, does not undertake to visit with capital punishment any type or character of forcible abduction or kidnaping, except that specific kind of kidnaping designated by law as "kidnaping with intent to hold for ransom." See: Finch v. State (Fla.), *supra;* People v. Bruno, 140 Cal. Appe. 460, 35 Pac. (2nd) 391. Compare: Hallowwa, 138 Cal. App. 174, 31 Pac. (2nd) 821.

Webster's New International Dictionary (2nd Edition) defines the word "ransom" as "the money, price or consideration paid or demanded for the redemption of a captured person or persons; a payment that releases from captivity." It is obvious that the word "ransom" as employed in the statute is so used in its common and ordinary sense. Therefore the statutory phrase "with intent to hold * * * for a ransom" as found in Chapter 16063, Acts of 1933, means a kidnaping or forcible abduction with the specific intent to hold the abducted person in unlawful captivity until a sum

of money or other thing of value is paid either by himself or by someone else in his behalf, to secure his or her release. So the gist of the offense is not the forcible or secret confinement, imprisonment, inveiglement or kidnaping without lawful authority, but is the felonious act of so doing *with intent to hold for a ransom* the person so kidnaped, confined, imprisoned, inveigled, etc.*

On the other hand, kidnaping at common law was treated as an aggravated species of false imprisonment. While by the Jewish and civil law kidnaping *per se* was punishable with death, yet by the common law, the crime was deemed

*The so-called "Lindbergh Law" enacted by Congress is substantially the same and reads as follows: "Whoever shall knowingly transport or cause to be transported, or aid and abet in transporting, in interstate or foreign commerce, any person who shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away by any means whatsoever and held for ransom or reward or otherwise, except, in the case of a minor, by a parent thereof, shall, upon conviction, be punished (1) by death if the verdict of the jury shall so recommend, provided that the sentence of death shall not be imposed by the court if, prior to its imposition, the kidnaped person has been liberated unharmed, or (2) if the death penalty shall not apply nor be imposed the convicted person shall be punished by imprisonment in the penitentiary for such term of years as the court in its discretion shall determine; *Provided* that the failure to release such person within seven days after he shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away shall create a presumption that such person has been transported in interstate or foreign commerce, but such presumption shall not be conclusive." (June 22, 1932, c. 271, Sec. 1, 47 Stat. 326, as amended May 18, 1934, c. 301, 48 Stat. 781) 18 U. S. Code Ann., 1934, Supplement, par. 408a. See article, "Kidnaping and the So-called Lindbergh Law," by Fisher and Maguire, 12 N. Y. University Law Quarterly Review 646 (June, 1935) for an elaborate discussion on the law of kidnaping under modern statutes.

a mere misdemeanor punishable with fine, imprisonment and the pillory. Note 4 Am. St. Rep. 447.

At comon law kidnaping was defined as the forcible abduction or stealing away of a man, woman or child for the purpose of carrying the person imprisoned out of his own country and beyond the protection of its laws. But under the modern conception and definition of the term "kidnaping" it is not now necessary to show that the person kidnaped was carried outside the state, or seized with that intent. It is sufficient to constitute kidnaping, within the modern view of that offense, that there be an asportation and carrying away of the party injured without any lawful warrant or authority therefor, with the intent of unlawfully imprisoning or secreting the abducted person without authority of law, the particular nature or intent with which the kidnaping is done being immaterial, except as the showing of some specific intent is required by statute. State v. Holland, 120 La. 429, 45 Sou. Rep. 380, 14 Ann. Cas. 692; 8 R. C. L. 319, *et seq.*

At the trial of the plaintiffs in error of the offense of kidnaping with intent to hold for ransom, the Court below undertook to define the term 'kidnaping' by charging the jury on that subject as follows:

"Kidnaping is a forcible and unlawful abduction and carrying away of a person from his or her home, without his or her consent or will, with the intent to deprive him or her of some right, * * *"

The charge was erroneous and misleading as applied to a case prosecuted under Chapter 16063, Acts 1933, because "kidnaping" as by that Act made punishable with death, is more than a forcible and unlawful abduction and carrying away of a person from his or her home without his or her consent or will, *with the intent to deprive him or her of*

*some right,* as charged by the Court to the jury in this case.

To correct and amplify the instruction thus given by the trial judge in his general charge to the jury, the defendants requested a special charge as follows:

"20. Gentlemen, I charge you that if you believe from the evidence that these defendants assaulted, beat, threatened and abused Mrs. Phelps and carried her away from her home forcibly and secretly with the intent to extort from her the hiding place of her money; but without any intent to hold her for a ransom to be paid for her release, you cannot convict them of the charge contained in the indictment upon which they are on trial."

The special charge so requested in writing was refused by the judge on the ground that it was already covered in his general charge. However, the definition of kidnaping as that term is used in Chapter 16063, and was employed in the indictment in this case comprehends as we have already demonstrated, more than the mere abduction and carrying away of a person from his or her home, without his or her consent, *with intent to deprive him or her of some right,* as the court charged the jury. The intent involved is a specific intent to not only abduct and carry away the person to deprive him of some right, but to hold him for ransom, and the charge was accordingly misleading in that it did not correctly inform the jury of the nature of the intent required to constitute "kidnaping" under the particular indictment and statute involved in this case.

It was therefore propitious for the defendants to seek by appropriate special instructions to correct the impression made on the jury's mind by the general charge, by having the offense of kidnaping for the purpose of extorting information as to the hiding place of money distinguished from the capital offense of kidnaping for ransom. So the court

erred in refusing to give defendants' special charge No. 20.

In Cruce v. State, 84 Fla. 191, 93 Sou. Rep. 134, the argument was advanced that the mere omission of the word "design" from one of the charges given in connection with the definition of the offense of murder in the first degree should be disregarded as harmless in view of the nature of the evidence and other charges given. At first a majority of the Court accepted that view and affirmed the judgment of death imposed upon Cruce in that case.

However, upon rehearing in the Cruce case a majority of the Court reversed the conviction of the defendant, holding in effect that whenever a defendant is sentenced to suffer capital punishment he should be awarded a new trial whenever a clearly erroneous charge is given, although it might seem to be purely technical in character. In that case Mr. Chief Justice Browne, whose dissent from the affirmance of the judgment as first announced, was later agreed to by a majority of the Court on rehearing, declared: "Human life is too dear and too sacred to be taken lightly. Courts should show a scrupulous regard for human life and teach by example that it must not be lightly taken." In Finch v. State, 156 Sou. Rep. (Fla.) 489, supra, the judgment was likewise reversed in a kidnaping case because of an erroneous instruction defining the offense.

We therefore hold that by reason of the erroneous purport of the general charge coupled with the refusal of the trial court to give defendants' requested charge No. 20 or some more correct charge equivalent thereto, the defendants were deprived of the substantial right to a correct charge on the law of the case, which they insisted on, and to which they were entitled in view of the nature of the trial judge's own instructions to the jury, and that for such error a new trial should be awarded.

Reversed for a new trial.

TERRELL and BROWN, J. J., concur.

ELLIS, J. (concurring in part).—I think the requested instruction No. 20 was erroneous, contradictory in its terms and conveys no clear ideas of standards by which the term ransom may be understood. The general charge on kidnaping was bad.

BUFORD, J. (concurring specially).—I concur with the view expressed in the majority opinion that the judgment herein should be reversed because of the charges mentioned in that opinion.

I think, however, that there is ample substantial evidence in the record to sustain the verdict and judgment and that the verdict was just what it should have been under the evidence had the erroneous charges not been given.

I do not think there is any substantial evidence that Mrs. Phelps was voluntarily released and returned to her home without the exaction of any sum of money or other thing of value. As I read the record it conclusively established the fact that the offer to return the old woman to her home was based on the condition that she would there deliver to the accused the money which she had saved and hidden away, that they did not start on that return journey until this old, feeble and wounded woman, who had been beaten and dragged from her humble home dressed only in her night gown, had promised to give the boys her money if they would take her back home and that her abandonment and release of her before she carried out that promise was solely because they were suddenly confronted with a crowd of people which they dared not face. That when they discovered the presence of the crowd gathered at the place where the accused expected and intended to collect the ransom for the old lady's return to her home and liberty they jumped

from the automobile, which was running, and abandoned the automobile and the hope of getting money at one and the same time. No one contends that they gave the automobile to the old lady, though they fled from it without stopping it and left her as the only occupant.

I agree to the reversal because the most guilty as well as the innocent are entitled to the benefit of trial in accordance with fixed legal principles and in this case I cannot say that members of the jury were not influenced to the prejudice of the defendants by the too broad definition of the offense charged as pointed out in the majority opinion.