MIDGETT *v.* STATE

[No. 81, September Term, 1957.]

*Decided March 4, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Herbert Myerberg,* with whom was *Lee H. Kramer* on the brief, for appellant.

*James H. Norris, Jr., Special Assistant Attorney General,* with whom were *C. Ferdinand Sybert, Attorney General, J. Harold Grady, State's Attorney for Baltimore City, James W. Murphy* and *Thomas C. Nugent, Assistant State's Attorneys,* on the brief, for appellee.

HORNEY, J., delivered the opinion of the Court.

This is an appeal by Curtis Edward Midgett, (Midgett *or* the defendant), who was convicted by a jury in the Criminal Court of Baltimore (Warnken, J.) of armed robbery and kidnapping and was sentenced to consecutive terms in the Maryland Penitentiary of twenty years for armed robbery and fifteen years for kidnapping, a total of thirty-five years. The defendant was tried jointly with Morris Ruckle, (Ruckle), and John Davis, (Davis), on separate indictments for armed robbery and similar offenses, and a joint indictment for kidnapping. Davis, who was convicted of both offenses and was sentenced to a total of fifteen years, did not appeal. Ruckle, who was also convicted of both crimes and was also sentenced to a total of thirty-five years, appealed, but subsequently dismissed his appeal.

In substance the defendant was charged in the first count of the indictment with armed robbery by feloniously robbing Charles W. Zeller, a police officer, with a dangerous and deadly weapon, and violently stealing the police officer's service revolver, police belt and holster, and flashlight, having a total value of $76.98. The indictment also charged the defendant with five other offenses in six counts, but all except the first count were abandoned by the State at the close of all the evidence.

The kidnapping indictment charged the defendant with feloniously, forcibly and fraudulently "* * * [carrying] and * * * [causing] to be carried within this State a certain person, to wit, Charles W. Zeller, with intent to have [him] carried within this State."

The State adopted the statement of facts prepared by counsel for the defendant as substantially correct. We shall do likewise insofar as we deem it necessary for the purpose of this decision. A comparison of the summary of facts in the brief with the record demonstrates its complete accuracy.[1]

The defendant and Ruckle came to Baltimore from Chester,

---

1. We commend the learned court-appointed counsel for the overall excellence of his brief for the defendant, which has furnished us with unusual assistance.

Pennsylvania, on January 15, 1957, for the purpose of robbing the White Coffee Pot Restaurant. They enlisted the aid of Davis, and together they drove around Baltimore in Ruckle's automobile making plans for the hold-up by observing the movements of the supervisor who collected the receipts from the various restaurant sites. All three drove back to Chester and returned to Baltimore the next day in the defendant's automobile, at which time they made further exploratory observations. They decided to go to the main office or commissary of the chain of restaurants on Frederick Avenue to determine whether the supervisor had brought the money there, and, if so, to rob him in the office. They turned off Frederick Avenue into Landwehr Lane, a small street or alley behind the restaurant office, and pulled into a parking area. The defendant and Ruckle got out of the automobile and walked around to the front of the restaurant's office, but, being unable to determine if the money was there they returned to the automobile. It was then approximately 11:30 P. M., and, as they reached the automobile, they saw the headlights of another automobile coming down the alley. The defendant got back in his automobile but Ruckle, when he saw it was a police car, crouched down on the other side of the automobile.

The sole occupant of the police car was Officer Charles W. Zeller, (Officer Zeller *or* officer), who stopped his car, came over to the defendant and asked him what his business was there. The defendant got out of his automobile and replied that they were just leaving. The officer asked to see the defendant's registration card. The card was shown. But, the defendant, who did not have an operator's license with him, volunteered that he was not driving, and that the other man was. In the meantime, the officer was shining his flashlight in all directions, and he asked the defendant where the other man was whom the officer had seen walking up the alley. The defendant replied that he was relieving himself. The officer then started around to the other side of the defendant's automobile and, as he cleared the bumper, he encountered Ruckle. The testimony of the officer at this point is vivid: "[Ruckle] jumped up from the right side of the

automobile * * * and shoved a long barrel 38 pistol at me and said, 'Officer, don't move or I will kill you.' At that time I went for my gun and he said, 'Don't pull that gun out.' So, I put my hands up in the air when he threatened me, and my one hand went in the air and one hand went in my pocket * * *." The defendant was behind the officer as Davis got out of the automobile. The officer began backing up and kept "hollering all the time, 'Don't shoot, you can have the gun.'" When the officer backed up to the wall, "he put his hand down real quick to the gun" and the defendant walked between the officer and Ruckle and moved the officer's hand away from the revolver. The officer admitted on cross-examination that he "kept an idea of trying to pull * * * [his] hand down to * * * [his] gun before they took it away from * * * [him]." Ruckle then directed the defendant to get the officer's revolver but he could not get it out of the holster. In order to get the revolver, Davis and the defendant removed the officer's coat and with the officer's help succeeded in getting the belt and holster off with the revolver in it. The defendant then took the "gunbelt, nightstick, flashlight all was together, or whatever it was, and put it in the front of the car." The defendant was unable to get the revolver out of the holster because of a spring which he did not know how to work. He testified that he would not have taken the gunbelt and holster had he been able to remove the revolver from the holster. The officer pleaded with the man to take his revolver and let him go, but Ruckle replied: "You have caught us in a big act, we have got to take you with us."

The officer was placed in the defendant's automobile. Before they drove off, Davis went over to the police car, took the keys out of the ignition switch and threw them away. They drove out the Washington Boulevard towards Washington, looking for a place to tie up the officer and leave him, until they came to a point about ten miles out of Baltimore when they pulled into a road near a farm house, stopped and tied the officer's hands and legs with rope. The officer testified that before he was taken out of the automobile Davis asked him how much money he had. When informed that the

officer had a dollar, Davis stated: "I love to rob a policeman, I think I will take the dollar." The officer told Davis he could have it, but he replied: "No, I won't take it." According to the officer, Davis then called attention to the officer's watch but "he decided not to take * * * [it]." The officer was then taken from the automobile and was left tied to a tree near the farm house. The only articles taken from the officer were his belt, holster, revolver and flashlight. All of these items, except the flashlight, were subsequently recovered and offered in evidence. The robbery indictment charged the defendant only with the larceny of the items enumerated.

After leaving the officer, the defendant and his companions drove towards Washington. After going about two miles they turned around and drove past the place where they tied up the officer, who in the meantime had freed himself. It was at this time and in this vicinity that Ruckle finally succeeded in freeing the revolver from the holster. He threw the belt and holster out the window and down a bank alongside the highway. They then proceeded again in the direction of Washington. When they got near Silver Spring, Ruckle got out of the automobile, took his own revolver and the officer's and hid both in a woods off the highway. At Silver Spring Ruckle left the automobile and Davis and the defendant proceeded to the outskirts of Washington, where Davis got out, boarded a bus and returned to Baltimore. The defendant drove into Washington alone, stopped for gas and found the officer's flashlight under the front seat of his automobile. He threw it out the window on a street in Washington and drove back to Chester. In the meantime, Ruckle telephoned from Silver Spring to his brother in Chester, who drove to Silver Spring with an uncle to pick up Ruckle. Before leaving Silver Spring Ruckle recovered the revolvers he had hidden and took both back to Chester. For a short period of time the uncle, at Ruckle's request, kept the officer's revolver under the mattress of his (the uncle's) bed. A day or two later the defendant called on Ruckle in Chester, at which time Ruckle gave the officer's revolver to the defendant and told him to throw it in the river. The defendant took the revolver, left Chester and drove south. Near Wilmington

he hid it on a side road and proceeded to Florida. The revolver was recovered from some shrubbery in Claymont, Delaware, where the defendant had hidden it.

During the course of the trial, the defendant became involved in a dispute with his court-appointed counsel concerning certain aspects of his defense, including the right of removal of the trial outside of Baltimore City. The defendant prepared a letter to the trial judge, setting forth in some detail the nature of the disagreement between himself and his counsel, wherein he appealed to the judge for permission to question any and all witnesses personally and above all to have Officer Zeller return to the witness stand. He had the note passed up to the Bench while the State was still putting on its case. The judge did not read the letter. Subsequently, when the defendant took the witness stand in his own behalf he proceeded to berate his counsel for refusing to ask questions of the State's witnesses on cross-examination, particularly the officer, and for not withdrawing from the case so that he could personally ask the questions he wanted asked. The trial judge promptly intervened in the controversy, and following the colloquy which then ensued between the court and the defendant, handed the letter to the defendant's counsel without reading it and instructed counsel to proceed.

At the close of all the evidence the defendant moved for a directed verdict on both the robbery and kidnapping charges. Both motions were refused. After the arguments of counsel on both sides, the trial court orally gave its advisory instructions to the jury on both charges. The defendant excepted to the instructions with respect to the charge of kidnapping (i) because "kidnapping" was not properly defined, (ii) because the indictment did not charge the crime of kidnapping, and (iii) because the indictment was silent as to an "intent to conceal the policeman". The defendant did not specifically except to the court's instruction as to the "standstill" kidnapping. And no question as to the failure of the indictment to charge the crime of kidnapping was raised on appeal.

The jury retired to consider its verdict at 3:34 P.M. It did not return with a verdict until 6:32 P.M. In the mean-

time, the defendant, and his co-defendants, were removed from the courtroom and confined in the lockup in the basement of the court house, where they remained until the jury returned to announce its verdicts. After the jury retired to deliberate, the court proceeded to hear and dispose of other matters. While so engaged the bailiff or clerk handed the court a note from the foreman of the jury which stated in substance: "If found guilty of kidnapping can we be assured the death penalty will not be given?" Counsel for the defendant was absent at the time, as was the defendant, whereupon the court wrote on the note the word "Yes" and returned it to the jury. The jury continued its deliberations, and after the lapse of a considerable period of time, the note was again sent to the court with substantially the following question: "Can verdict be stated guilty of kidnapping with assurance of no death penalty?" On this occasion counsel for all of the defendants, but not the defendants themselves, were present, and the court showed them the whole note. Thereupon the court wrote in substance the following answer and again returned the note to the jury: "If verdict is guilty, death sentence will not be imposed." The jury then came in with a verdict of guilty on both charges. After the second note had been submitted to the court, and while the defendant was still absent, the trial judge dictated the following statement into the record: "The jury had sent a note to me in * * * [the kidnapping case]. Can we find a verdict of guilty with assurance of no death sentence and I have written on there, yes. Is that agreeable to you all?" Obviously, the words "you all" referred to counsel for all of the defendants. If counsel made a reply to the court's question, it was not recorded by the reporter. After the verdicts had been received the court advised the jury, among other things, to the effect that the matter of punishment did not concern the jury, and reminded it that the Assistant State's Attorney had advised it in his argument that the State was not seeking capital punishment and that in all probability the judge would not impose such sentence.

The defendant contends: (i) that his motion for a directed verdict on the charge of robbery should have been

granted; (ii) that the jury was incorrectly instructed on the law applicable to the charge of kidnapping; (iii) that it was reversible error for the trial court, in the absence of counsel, to answer a question propounded by the jury after it had retired and was still deliberating; (iv) that it was reversible error for the trial court, in a capital case, to assure and promise the jury that the death penalty would not be imposed by the court if the jury should find the defendant guilty of kidnapping; and (v) that the defendant was denied a fair trial when the trial court refused to consider the defendant's complaints as to certain disagreements between the defendant and his court-appointed counsel.

We shall consider the third and fourth points or questions of law first. It is conceded that the defendant was absent from the courtroom on the two separate occasions when the trial court undertook to answer questions which had been addressed to the court by the jury. The answers were not given to the jury in open court but through an exchange of notes while the jurors remained in their jury room. It is also conceded that on the first occasion counsel for the defendant was absent; and that on the second occasion counsel was present and was informed by the court of the questions propounded and the answers thereto.

In this State there is no doubt that an accused in a criminal prosecution for a felony has the absolute right to be present at every stage of his trial from the time the jury is impaneled until it reaches a verdict or is discharged, and there can be no valid trial or judgment unless he has been afforded that right. The constitutional guarantee includes the right of the accused to be present (i) when the jury is charged or instructed on the facts, the law or the form of the verdict, before it has begun its deliberations or afterwards upon its request or by direction of the court; (ii) when the court is repeating a charge or instruction previously given in whole or in part; (iii) when the court communicates with the jury in answer to questions propounded by the jury, or (iv) when there shall be any communication whatsoever between the court and the jury; *unless* the record affirmatively shows that such communications were not prejudicial or had no tendency

to influence the verdict of the jury. Furthermore, the right to be present is personal to the accused and cannot be waived by his counsel. *Duffy v. State,* 151 Md. 456, 135 A. 189 (1926); *La Guardia v. State,* 190 Md. 450, 58 A. 2d 913 (1948); Constitution of Maryland, Declaration of Rights, Art. 5.

In *McBean v. State,* 83 Wis. 206, 53 N. W. 497 (1892), in which the defendant was convicted of assault with intent to kill, the jury, after it had retired, upon inquiring whether it could depend on clemency on finding a verdict of guilty, was sent a reply that it could. The jury found the defendant guilty and recommended mercy. The Supreme Court of Wisconsin, in reversing the judgment held that:

> "The error consists of the promise made by the trial judge to the jury, to the effect that, if they found McBean guilty, they might rely upon him to extend the clemency of the court to the prisoner. * * * The promise thus secured was well calculated to overcome reasonable doubts and coerce an agreement for conviction. It was an unauthorized interference with the deliberations of the jury."

A similar decision was reached in *State v. Kiefer,* 16 S. D. 180, 91 N. W. 1117 (1902). See also *Lovely v. United States,* 169 F. 2d 386 (4th Cir. 1948); *Demetree v. United States,* 207 F. 2d 892 (5th Cir. 1953); *Territory v. Griego,* 8 N. M. 133, 42 P. 81 (1895); *State v. Kernan,* 154 Iowa 672, 135 N. W. 362 (1912); *State v. Sweat,* 159 La. 769, 106 So. 298 (1925); and *State v. Doucet,* 177 La. 63, 147 So. 500 (1933). In *Shields v. United States,* 273 U. S. 583 (1927), it was held that it was reversible error for the judge, without giving notice to the defendant, to send a written instruction to a jury, that had been unable to reach a verdict, that it must find the defendant guilty or not guilty. And see *Strasheim v. State,* 138 Neb. 651, 294 N. W. 433 (1940), in which the "instruction" contained little more than a sharp reprimand by the court for the jury's hesitation in arriving at a verdict, a reminder of its immunity from outside influence, its supremacy in the matter, and a request for an

early unanimous verdict. However, the conviction was set aside on the ground that the constitutional and statutory rights of the defendant to a jury trial were violated when the court, without notice to, and in the absence of, the defendant and his counsel, instructed the jury orally while it was deliberating upon a verdict.

For the reasons stated, the judgments and sentences of the lower court must be reversed.

Since the judgment and sentence must be reversed as to Midgett and a new trial ordered, we deem it to be necessary and desirable for the guidance of the lower court and to avoid the expense and delay of another appeal to this Court to decide the points or questions of law raised by the objection to the instructions on the law applicable to the charge of kidnapping, and by the refusal of the motion for a directed verdict on the charge of robbery. See Maryland Rule 885 (Scope of Review).

On the objections to the instructions on the law applicable to the charge of kidnapping, we think it is clear that the instructions were not only misleading and confusing, but were particularly ambiguous with respect to the distinction between kidnapping and false imprisonment.

At common law, the offense of kidnapping was the forcible abduction or stealing away of a person and sending him into another country. "It was regarded as an aggravated form of false imprisonment, since it embraced all of the elements of that offense, with the *additional* element of carrying the victim out of his own country and beyond the protection of its laws." (Emphasis added.) 1 *Wharton, Criminal Law and Procedure,* Sec. 371 (1957). See also 2 *Bishop, Criminal Law,* Sec. 750 (9th ed. 1923); *Hochheimer, Law of Crimes and Criminal Procedure,* Sec. 317 (2d ed. 1904). Although at common law, the accused had to carry the person kidnapped into *another country* before he was subject to prosecution for kidnapping, statutes concerning the offense in this country have usually provided that both *intra-state* as well as *inter-state* kidnapping are felonies and severely punishable. See Code (1951), Art. 27, sec. 403. False imprisonment, which is punishable as an aggravated assault, is merely

the unlawful detention of a person against his will. *Clark and Marshall, Treatise on the Law of Crimes,* Sec. 220 (5th ed. 1952); *Hochheimer, op. cit. supra,* Sec. 316. Although false imprisonment in most states is punishable by statute, it is a common law offense, and, in the absence of a statute, is punishable as such, as it is in this State. For a discussion of the distinction between false imprisonment and kidnapping see *Smith v. State,* 63 Wis. 453, 23 N. W. 879 (1885). See other discussions in *Click v. State,* 3 Tex. 282 (1848), and *Keith v. State,* 120 Fla. 847, 163 So. 136 (1935), and the dictum in *Vandiver v. State,* 97 Okl. Cr. 217, 261 P. 2d 617 (1953), to the effect that the mere taking of a woman into an automobile without driving away would not be kidnapping.

Statutes in many states, but not in Maryland, tend to obliterate the distinction between the two offenses. Thus, detention for certain specified purposes, such as robbery, extortion, revenge, money, or a reward, which had formerly been considered false imprisonments, have been included in the definition of kidnapping. Some states have gone further and have provided that any seizure of a person with the mere intent secretly to confine or imprison him, or to hold or detain him against his will, would constitute kidnapping.[2] Art. 27, sec. 403, *supra,* provides:

> "Every person, * * * who shall be convicted of the crime of kidnapping and forcibly or fraudulently carrying or causing to be carried out of or within this State any person, * * * with intent to have such person carried out of or within this State, or with the intent to have such person concealed within the State or without the State, shall be guilty of a felony * * *."

Obviously, this State has not abolished the distinction between false imprisonment and kidnapping. Indeed it has adopted the basic common law concept that to constitute kidnapping there must be a *carrying* of the person from the

---

2. See Note, "A Rationale of the Law of Kidnapping", 53 Colum. L. Rev. 540 (1953).

place where he is seized to some other place either out of or within this State. The statute also specifies that there must be an *intent to carry* such person to such other place or, in the alternative, an *intent to conceal* such person in or out of this State. As we have previously indicated, the failure to distinguish between false imprisonment and kidnapping, which resulted in the erroneous instruction to the effect that the officer did not have to be carried from the place where he was seized—which constituted the so-called charge of a "standstill" kidnapping—was not only entirely unnecessary, but was clearly improper under the indictment and the proof.

Since the indictment in this case charged the defendant with *carrying* the seized officer, *with intent to have him carried,* but did not charge the defendant *with intent to have him concealed,* it is clear that any reference in the charge or instruction to the word "concealed" could have the effect of misleading and confusing the jury and was highly prejudicial to the defendant. In the case of *State v. Altemus,* 76 Kan. 718, 92 P. 594 (1907), in which the defendant was indicted for kidnapping under a statute which contained a number of cumulative and alternative elements, among which was "inveigling or decoying", in addition to other elements, the indictment charged "inveigling and decoying", but there was no proof of those elements. In reversing the conviction because of error in the trial court's instructions to the jury, the Court said:

> "It seems that the evidence does not justify any instruction in regard to inveiglement and decoying. These elements of the crime are charged, but are not supported by any evidence. 'An instruction ought not to be given, although it is a correct statement of the law in the abstract, which is not applicable to the facts that are in evidence.'"

*A fortiori* an abstract instruction ought not to be given where it is not applicable to the offense charged in the indictment.

In a civil case the granting of a prayer, which is calculated to be misleading although it contains an otherwise correct abstract statement of the law, is reversible error. *Wash. Fire Ins. Co. v. Davison,* 30 Md. 91 (1869) ; *B. & O. R. R.*

*v. Boyd,* 67 Md. 32, 10 A. 315 (1887). It is also reversible error to give an instruction on a particular issue unless such issue is presented by the pleading and proof. *Ritterpusch v. Lithographic Plate,* 208 Md. 592, 119 A. 2d 392 (1956); *Wintrobe v. Hart,* 178 Md. 289, 13 A. 2d 365 (1940). In the *Wintrobe* case, *supra,* we distinguished between an instruction which is merely erroneous but at least instructs and a misleading and confusing instruction which does not instruct at all. The erroneous though instructive instruction may not be reversible when it appears that the opposite party was not injured. But, as we said, at p. 296: "* * * instructions which are ambiguous, misleading, or confusing to jurors can never be classed as non-injurious." We hold that this is especially true in a criminal case where the jury is the judge of both the law and the facts and the instruction is merely advisory. We reiterate that the erroneous definition of kidnapping coupled with an irrelevant reference to an intent to "conceal" the officer, made the instruction misleading and confusing and clearly prejudicial by diverting the mind of the jury from the single charge of carrying with an intent to "carry", and directing its attention to the more aggravated element of the offense of kidnapping with which the defendant was not charged.

On the refusal of the motion for a directed verdict on the charge of robbery, we think it is clear that the refusal of the trial court to grant the motion was proper. Under the Constitution of this State, Art. XV, sec. 5, we have the right and duty, when a question is properly submitted, to pass upon the legal sufficiency of the evidence in a criminal case. The question here is whether the evidence produced is sufficient to show either directly or by a rational inference that the defendant had an intent to *steal* when he participated in the "taking and carrying away". While it is true that there can be no robbery without a larcenous intent, such intent may be ascertained and determined from the words, acts and conduct of the accused. *77 C. J. S. Robbery,* Sec. 22. In the case now before us, there is evidence that the defendant and his co-defendants took and carried away the officer's service revolver, police belt, holster and flashlight at the same time

they carried the officer away, when they might have left the officer's equipment—particularly the flashlight which they never needed to disarm him—in the police car if they had no intent to steal the equipment or any part of it. Although some of the property taken was finally discarded, the revolver was subsequently recovered by Ruckle from the place it had been concealed and was eventually given to the defendant, who took it and hid it where he could easily recover it. Of course, an intent formed subsequent to the taking is immaterial, but subsequent appropriation is a circumstance to be considered, along with all other relevant facts, in determining the existence of an intent to steal at the time of the initial taking.

We believe that under the evidence in this case the question of the intent of the defendant is peculiarly a jury question. In this State, where a jury is the judge of both the law and the facts in a criminal case tried by a jury, the weight of the evidence, or whether the State has proven its case ·beyond a reasonable doubt, are matters which the jury should determine. *Yanch v. State,* 201 Md. 296, 93 A. 2d 749 (1953); *Dodson v. State,* 213 Md. 13, 130 A. 2d 728 (1957); *Daniels v. State,* 213 Md. 90, 131 A. 2d 267 (1957).

In *Rex v. Holloway,* 5 C. & P. 524, 172 Eng. Rep. 1082 (1833), the accused was indicted for stealing a gun by force from the prosecuting witness who was one of the gamekeepers of the manor of Deconsfield. The gamekeeper, having met the accused and another man, whom he knew to be poachers on a part of the manor, seized the accused. The other man rescued the accused, whereupon the accused wrested the gun from the gamekeeper and ran away with it. There was evidence to the effect that the next day the accused was heard to say that he would sell the gun. The gun was never recovered. The case was tried before a jury. The trial judge in summing up instructed the jury that the accused "might have imagined that the * * * [gamekeeper] would use the gun so as to endanger his life; and, if so, his taking it under that impression would not be felony; but if he took it intending at the time to dispose of it, it would be felony. * * * It is a question peculiarly for your consideration."

In *Bailey v. State,* 92 Ark. 216, 122 S. W. 497 (1909), the Court held that there was sufficient evidence from which it could have been found that there was no intent to steal the revolver, but also said that whether there was *an intent to steal* was a jury question.

In *Mahoney v. State,* 33 Tex. Crim. 388, 26 S. W. 622 (1894), the defendant escaped from prison by disarming a guard, tying him up and fleeing with his pistol. The defendant testified that he intended to return the weapon to the guard, but he sold it instead, so that there was a question as to whether the defendant was telling the truth.

Since there was evidence before the jury in the instant case, which, if believed, would sustain a conviction for armed robbery, the motion for a directed verdict was properly refused.

We are unable to conclude that the error in instructing the jury in the kidnapping case out of the presence of the defendant was not also an unauthorized interference with the deliberations of the jury in the robbery case. When the robbery charge is retried there should be a specific instruction to the jury on the question of the intent to steal. Apparently, the issue was not raised at the original trial, but when the charge of robbery is retried, the trial judge should instruct the jury to the effect that, if it finds that the defendant, by taking and carrying away the equipment of the officer, intended to steal it, then the verdict should be "guilty", but, if it finds that he merely intended to disarm the officer, without an intent to steal his equipment at the time it was taken and carried away, then the verdict should be "not guilty".

In making this decision we have not overlooked the cases cited by the defendant, including *Fortenberry v. State,* 190 Miss. 729, 1 So. 2d 585 (1941); *Bailey v. State,* 139 Tex. Crim. 260, 139 S. W. 2d 599 (1940); and *Jones v. Commonwealth,* 172 Va. 615, 1 S. E. 2d 300 (1934),[3] and the case

---

3. The cases of *State v. Morris,* 96 W. Va. 291, 122 S. E. 914 (1924), *Butts v. Commonwealth,* 145 Va. 800, 133 S. E. 764 (1926), and *Southerland v. Commonwealth,* 217 Ky. 94, 288 S. W. 1051 (1926) were either not in point or were distinguishable for other reasons.

of *United States v. Durkee,* 25 Fed. Cas. 941, No. 15,009 (C. C. N. D. Calif. 1856), not cited by either party.

Since there is to be a new trial on both the robbery and kidnapping charges, there is no reason for us to consider the fifth and final question raised by the defendant as to his complaints against the attorney who represented him at the trial in the lower court.

> *Judgments and sentences reversed, and a new trial is hereby awarded on both the robbery and kidnapping charges; the Mayor and City Council of Baltimore City to pay the costs.*